588 So.2d 204 (1991)
Josephine SARTAIN
v.
Lloyd and Bess WHITE.
No. 07-CA-58737, 90-CA-0223.
Supreme Court of Mississippi.
October 9, 1991.
*205 Tom P. Calhoun, Peteet Roberson Firm, Richard A. Smith, Greenwood, for appellant.
Murray L. Williams, Water Valley, for appellees.
Before DAN M. LEE, P.J., and ROBERTSON and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
Josephine Sartain returns once again to this Court, appealing a $600,000.00 judgment ($300,000.00 compensatory damages and $300,000.00 punitive damages) taken against her in Yalobusha County Circuit Court. She raises numerous errors concerning the lower court proceeding, most of which have to do with her mental capacity, or lack of it. Because the law supports it, because we have no other alternative, and because we hope to finally put this litigation to an end, we affirm.

I.
The facts are long and sad, but a recitation is necessary. On May 29, 1984, Josephine Sartain and her husband, Doyle, residents of Water Valley, Mississippi, filed suit in the County Court of Yalobusha County against Lloyd and Bess White, who live on the same street as the Sartains. The complaint alleged that Bess White had pointed a rifle at Josephine Sartain and had threatened to kill her. The complaint further alleged that Lloyd White had pointed a gun at Doyle Sartain on another occasion and had threatened violence against the Sartains. The complaint maintained that these actions were part of a series of similar actions which had been going on since 1975. The Whites moved to dismiss the complaint, alleging that Yalobusha County did not have and never had a county court. The Whites also denied the pertinent allegations of the complaint. The complaint was dismissed on July 22, 1985.[1]
On August 22, 1985, Josephine Sartain filed an amended complaint in the Yalobusha County Circuit Court, setting out essentially the same allegations which had been made in the previous complaint. The Whites answered this complaint, once again denying its allegations. The Whites also counterclaimed against Mrs. Sartain, alleging that she had libelled and slandered the Whites by accusing them of acts of murder, assault, and theft. These alleged acts included the murder of Joel Edgar, who lived on the same street as the Whites and Sartains, the stealing of Edgar's property, and the attempted murder or assault of Mrs. Sartain. The Whites asked for actual and punitive damages of $1.2 million. Mrs. Sartain answered with a typed ten-page single-spaced tirade in which she repeated most, if not all, of the allegations included in the Whites' counterclaim. She subsequently filed a more conventional, amended answer in which she merely denied the allegations of the counterclaim.
On November 7, 1985, the Whites filed a set of interrogatories. The Whites subsequently filed a motion to compel Josephine Sartain to answer the aforementioned interrogatories. The Whites also moved to strike the amended answer to their counterclaim, alleging that it had been filed after the applicable time limit without leave of court. Just after the motion to strike, Jim Fraiser, who had been counsel to Mrs. Sartain, moved to withdraw as counsel. The court granted Fraiser's motion. The court also struck the amended answer to the counterclaim. On January 29, 1986, the court ordered Mrs. Sartain to answer the aforementioned interrogatories. It also ordered her to pay $250.00 for failure to answer the interrogatories.
Trial was set for July 28, 1986. On that day the Whites appeared for trial, while Josephine Sartain did not. On July 29, 1986, Lloyd and Bess White moved to dismiss Josephine Sartain's complaint, and *206 also moved for judgment against her due to her failure to prosecute or participate in the suit. On August 2, 1986, the circuit court dismissed Sartain's complaint due to her failure to comply with the orders of the court and with Miss.R.Civ.P. 41(b) and 37(b)(2)(C). It further awarded a judgment by default in favor of the Whites, and scheduled a trial solely for the purpose of assessing damages.
On August 7, 1986, a jury was chosen for the trial. Mrs. Sartain was present and represented by counsel, Omar Craig. Craig filed a motion to withdraw as counsel soon after. This motion was granted.
On September 2, 1986, Josephine Sartain filed a motion to rescind the court's order of August 2, which had dismissed her complaint and had awarded a default judgment in favor of the Whites. The motion mentioned briefly that she had filed her amended complaint at the suggestion of her former attorney, Mr. Fraiser. The rest of the ten-page motion was a rehash of the legion of people involved in the conspiracy against her and her late husband, including most of the lawyers, judges, and city officials of Water Valley.
The trial on damages was held on September 11-12, 1986. On this day Josephine Sartain filed with the court a motion to prevent the jury from hearing testimony on damages. Sartain alleged that she had received no notice as to the first hearing in this cause, that she had not had time to find an attorney, and that she had been prejudiced during the course of the litigation because of her deafness. She apparently filed the motion at the courthouse and then left, as she was not present for trial nor was she represented by counsel.
At the outset of the trial, the court reviewed the history of the case. The court also denied Mrs. Sartain's motion to rescind the order of August 2 and the motion to prevent the jury from hearing testimony. The Whites presented witnesses who testified that Mrs. Sartain had over the years verbally, in public, and through letters to others, accused the Whites of various criminal acts, including assault, theft, and murder. One of the specific acts mentioned repeatedly was the alleged murder of Joel Edgar, who was married to Bess White's sister, and the theft of his property. Evidence was introduced to show that Joel Edgar had died of natural causes. Another accusation was that the Whites had hired one James Hoskins to run over Sartain with an automobile. She had also accused various city officials, attorneys (including Murray Williams, counsel for the Whites), judges, and law enforcement officers of acting in concert with the Whites in perpetrating or covering up these acts. She had on occasion stood on her property and screamed these accusations across the street at the Whites. The Whites had even taped several of these outbursts and had made transcripts of them. These tirades had taken place when the grandchildren of the Whites were present, as well as other visitors. Both Lloyd and Bess White testified that the constant verbal harassment had detrimentally affected their health. They also stated that they were hesitant to have visitors. They introduced evidence to the effect that the value of their property had decreased because of the actions of Mrs. Sartain. Guy Dale Shaw, tax assessor/collector of Yalobusha County, stated that the value of real property in Yalobusha County owned by Josephine Sartain, not including timber growing on some of the land, was $146,100.00. The jury eventually returned an award of $300,000.00 in actual damages and $300,000.00 in punitive damages. Josephine Sartain subsequently moved for a new trial. This motion was denied.
On December 15, 1986, Josephine Sartain, represented by present counsel, filed a motion to set aside the judgment rendered against her. The grounds for relief included: (1) Mrs. Sartain had a meritorious defense to the action of defamation; (2) Mrs. Sartain was at all times during the pendency of the litigation grossly delusional and incompetent; (3) she had not received valid notice; (4) the judgment was rendered by mistake; (5) counsel was in possession of newly discovered evidence; (6) the judgment was void; (7) the court erroneously granted certain jury instructions. The motion was supported by the affidavit of Dr. *207 Michael Whelan, a psychologist, which stated that Mrs. Sartain was paranoid schizophrenic.
After various delays, the hearing on the motion to set aside judgment was held on March 3, April 4, and April 5, 1989.
Josephine Sartain was called by the Whites as an adverse witness. She and Doyle Sartain had no children. Mrs. Sartain testified as to her viewpoint of the history of this litigation. As to her participation in the jury selection process before her damages trial, she stated that "I just let [Omar Craig] go ahead and do whatever he wanted. That's all I could do... . There wasn't any selection for me there... ." When asked about the damages trial and about not showing up, Mrs. Sartain stated: "I did not go because I could not have heard a word in that courthouse, and I was not represented." Mrs. Sartain had driven herself, accompanied by a friend, from Water Valley to Greenwood, to the October 30, 1986, meeting with Mr. Calhoun and Dr. Whelan. Mrs. Sartain had no knowledge of mental illness in her family. Mrs. Sartain managed her own money and financial affairs. Mrs. Sartain had no knowledge of anyone filing an action to appoint a guardian or conservator for her or to have her declared non compos mentis. No doctor had ever suggested that she seek psychiatric care or treatment. She had never physically harmed herself or anyone else. She did say that she was ready to use force, particularly a firearm, against someone trying to come into her house. She denied that she had ever heard voices or experienced hallucinations. On direct examination, Mrs. Sartain testified at length as to the nature of the conspiracy and the conspirators aligned against her.
The court identified the critical question as whether or not Mrs. Sartain could effectively respond to process, whether she was able to understand what the notice meant, whether she understood her need to be in court, and whether she had an understanding of the nature of the hearing and the consequences of her failure to appear. The court found that while Mrs. Sartain was clearly not a normal person, she did have the ability to understand the nature of the proceedings and the consequences of her actions pertaining to these proceedings. The court denied the motion to set aside the default judgment. Mrs. Sartain filed a motion for reconsideration, alternatively, to alter or amend judgment and a motion to stay the execution of the judgment. This motion was subsequently denied.[2]

II.
Josephine Sartain argues that she did not receive the requisite three days notice before the hearing of the application for default judgment pursuant to Miss.R.Civ.P. 55(b). She claims that she is due such notice because she appeared in this action. Rule 55 states in part:
(a) Entry. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his default.
(b) Judgment. In all cases the party entitled to a judgment by default shall apply to the court therefor. If the party against whom judgment by default is sought has appeared in the action, he (or if appearing by representative, his representative) shall be served with written notice of the application for judgment at least three days prior to the hearing of such application; however, judgment by default may be entered by the court on the day the case is set for trial without such three days' notice. If in order to enable the court to enter judgment or to carry it into effect it is necessary to take an account or to determine the amount of damages or to establish the truth of any *208 averment by evidence or to make an investigation of any other matter, the court may conduct such hearing with or without a jury, in the court's discretion, or order such references as it deems necessary and proper.
(c) Setting Aside Default. For good cause shown, the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).
(emphasis added).
"Default is not favored as a way to settle lawsuits. It is the policy of our system of judicial administration to favor disposition of cases on their merits." Wheat v. Eakin, 491 So.2d 523, 526 (Miss. 1986). Though a judge may enter a default judgment for failure to prosecute or to comply with procedural guidelines, this remedy is the most drastic "and should be applied only in extreme circumstances." State Security Life Ins. Co. v. State, 498 So.2d 825, 831 (Miss. 1986). This is one of those circumstances.
In State Security Life, the State had obtained a temporary restraining order against State Security Life. State Security Life was required to show why the restraining order should not be made permanent. State Security Life filed an answer which the trial court refused to strike. On the date of trial, State Security Life appeared and asked for a continuance, which was denied. The trial court subsequently entered a default judgment. Though this Court reversed the default judgment, it stated:
Under Rule 55 a party who has made no appearance whatsoever by himself or an attorney is not entitled to any notice before entry of default by the clerk, and entry of default judgment by the trial court. In this case there had been an appearance of sorts by the defendants, and if an attempt had been made to secure a judgment by default prior to the trial date, the three day notice provision of Rule 55(b) would have been necessary. See Charlton L. Davis & Co. v. Fedder Data Center, 556 F.2d 308 (5th Cir.1977) (appearance broadly defined); Segars v. Hagerman, 99 F.R.D. 274 (N.D.Miss. 1983).
However, since there was no effort to secure a pre-trial date default judgment, and instead the default judgment was rendered on the trial date, the three day notice provision of Rule 55(b) does not apply in this case.
State Security Life, 498 So.2d at 830-31.
Josephine Sartain cites Savoretti v. Rodriguez-Jiminez, 252 F.2d 290 (5th Cir.1958), which states only that the trial court may not enter a default judgment without following the notice requirements found in Rule 55. In the case at bar, Josephine Sartain appeared. Trial was set for July 28, 1986. Josephine Sartain did not appear on that day, in person or through counsel. The Whites did not move for a default judgment until the next day, July 29. The order of default judgment was not entered until August 2. If the three day notice requirement is not applicable where a default judgment is entered on the day of trial, then it appears that it should not be applicable here, where application for the judgment was not made until the day after trial and judgment was not entered until four days afterward. Mrs. Sartain had shown throughout the litigation that she had no intention of complying with the court's directives. Though default is drastic action, there was no error in failing to set aside the default judgment.
Josephine Sartain further argues that she did not have notice of certain pleadings during the course of this litigation, particularly notice of the default judgment.
Josephine Sartain filed her amended complaint on August 21, 1985. The Whites counterclaimed for defamation on September 20, 1985. Mrs. Sartain filed an answer to the counterclaim, obviously pro se, on October 24, 1985. She subsequently filed a more conventional answer on November 6, 1985. Though not signed by Jim Fraiser, Mrs. Sartain testified later that he drew up this particular pleading. The Whites filed a set of interrogatories on November 7, 1985. Murray Williams, counsel for the Whites, noted in the letter of service for *209 the interrogatories that he had received a copy of a letter on September 3, 1985, the original being addressed to Judge Carlson from Jim Fraiser, stating that he was no longer representing Mrs. Sartain and that she had told him that she had retained other counsel. Williams further noted that he had received on September 11, 1985, a copy of a letter from Carlson to Fraiser, saying that Fraiser needed to get permission from the court via motion before he could withdraw and that he should also submit an order of withdrawal, approved in advance by the newly retained attorney. On January 15, 1986, the Whites filed a motion to compel answers to the interrogatories and a motion to strike Sartain's amended answer to their counterclaim. The certificate of service on the motion to strike alleged the same statement as to Jim Fraiser's withdrawal as the earlier pleading.
On January 22, 1986, Jim Fraiser moved to withdraw as counsel of record. Judge Carlson signed the order releasing him on January 28, 1986. Neither the motion to withdraw nor the order contained anything about who counsel of record would be after Fraiser's withdrawal. Admittedly, these documents did not comply with Judge Carlson's instructions. On January 29, 1986, the court issued an order striking Sartain's amended answer to the Whites' counterclaim. On that same day the court ordered Mrs. Sartain to answer the interrogatories, giving her thirty days. It also ordered her to pay $250.00 in attorney fees. The order set a trial date of July 28, 1986. Both these orders contained the following language: "It is further ordered that the Clerk of this Court is ordered and required to mail, by Certified Mail, Return Receipt Requested, Restricted Delivery, a certified copy of this Order to Ms. Josephine Sartain, Young Street, Water Valley, Mississippi, 38965, henceforth, and immediately upon its entry, that she having due notice hereof may govern herself accordingly." According to the court, Mrs. Sartain received both of these documents.
The Whites moved for a default judgment on July 29, 1986. The default judgment was entered by the court on August 2, 1986.
At the hearing on the motion to dismiss, Mrs. Sartain testified that she did not understand why she was receiving pleadings in the fall of 1985 when Jim Fraiser was still attorney of record. She also testified that she conferred with Will Ford of New Albany about representing her. She testified about conferring with Robert Ryan of Senatobia, who had represented her in her suit with Bob Best, Sr. She testified that she had no knowledge of Jim Fraiser withdrawing from the case and that he subsequently had told her that he hadn't known about it either.
This Court has recently set aside judgments where counsel withdrew on the day of trial and no notice setting the matter for trial appeared in the record, Johnson v. Weston Lumber & Building Supply Co., 566 So.2d 466 (Miss. 1990), and where the clerk of court attempted to dismiss a case but mailed the notice of dismissal to the wrong address, Walker v. Parnell, 566 So.2d 1213 (Miss. 1990). In both of these cases the appellants were without fault. In the case sub judice, the lower court did not see that Mrs. Sartain was represented by counsel before it allowed Jim Fraiser to withdraw. The critical question seems to be whether or not Mrs. Sartain received notice of Fraiser's withdrawal. She claims that she did not. Fraiser's motion to withdraw as counsel shows that Mrs. Sartain had been served with a copy. The order allowing counsel to withdraw shows no certificate of service. Mrs. Sartain did receive copies of the motion to compel and the order to compel setting her trial date and giving her thirty days to comply with discovery. She thus had thirty days to straighten things out with Fraiser and six months to arrange for counsel for her trial. This matter could perhaps have been clarified if Jim Fraiser had testified at the hearing, but Sartain did not call him. Though it seems the lower court could have handled this matter differently, this Court cannot say that Sartain was prejudiced by the problems with notice. Her primary argument, once again, is that her mental condition reduced her to incompetence and *210 the court should have appointed a guardian ad litem to represent her. Considering Mrs. Sartain's past ability to find legal counsel, and considering that the court eventually found that there was no problem with mental competence, we must find that this assignment is without merit.

III.
The majority of the issues raised on appeal present different aspects of the same essential argument: Josephine Sartain was so mentally ill that the default judgment of liability and the ensuing damages award were made in error, and the trial court erred in not declaring the judgment void or at least setting it aside for a new trial. At the core of each of the arguments is the proposition that Mrs. Sartain's mental capacity meets the required standard such that the judgment cannot stand. Exactly what this required standard consists of is another matter, for this is not clear from statutory or common law. The Miss. Code Ann. § 1-3-57 (1972) states that "[t]he term `unsound mind,' when used in any statute in reference to persons, shall include idiots, lunatics, and persons non compos mentis." Section 41-21-61(e) (Supp. 1990) defines "mentally ill person" as follows:
[A]ny person who has a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (i) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (ii) poses a substantial likelihood of physical harm to himself or others as demonstrated by (A) a recent attempt or threat to physically harm himself or others, or (B) a failure to provide necessary food, clothing, shelter or medical care for himself, as a result of the impairment. This impairment does not include (1) epilepsy, (2) mental retardation, (3) brief periods of intoxication caused by alcohol or drugs, (4) dependence upon or addiction to any alcohol or drugs, or (5) senile dementia.
Both sides presented expert testimony at the hearing on the 60(b) motion. Dr. Michael Whelan, a psychologist, was the sole witness called by Josephine Sartain. Whelan interviewed Mrs. Sartain for 30-40 minutes on October 30, 1986, in Mr. Calhoun's law office, although he did not tell her the reason for the interview. He had seen Mrs. Sartain only once since the interview. Whelan's opinion was that Mrs. Sartain was paranoid schizophrenic and not competent to assist counsel in her defense. He stated that the basis of her intent to hurt or discredit the Whites was psychotic. He felt that Mrs. Sartain had been grossly delusional since the time he had first seen her and before that. Whelan felt that Mrs. Sartain's motion to rescind was admittedly an effort to get out from under the judgment taken against her but was nevertheless made up of the same "paranoid delusional nonsense" included in her other pro se pleadings.
Dr. Donald Guild, a psychiatrist, was called by the Whites. He was furnished certain documents, including the various pleadings written and filed by Mrs. Sartain, along with the tapes made of Mrs. Sartain by the Whites. Guild personally observed Mrs. Sartain while she was testifying during the hearing. Dr. Guild felt that Mrs. Sartain was delusional and that she did have difficulty separating fantasy from reality in some cases, but he did not think that she was paranoid schizophrenic. He did feel that Mrs. Sartain could differentiate delusion from reality as far as the issues in this litigation. He placed a great deal of significance on Mrs. Sartain's actions on the morning of the damages trial, particularly the filing of the motion to prohibit the jury from hearing testimony. Dr. Guild felt that while Mrs. Sartain's paranoid disorder had prevented her from having the best relationship with counsel, it had not prevented her from providing effective assistance to counsel. He did not feel that Mrs. Sartain represented a potential danger to herself or to others.
Dr. Charlton Stanley, a psychologist, testified for the Whites. Dr. Stanley had reviewed the same materials as Dr. Guild and had observed Mrs. Sartain on the witness *211 stand during the hearing. Dr. Stanley did feel that Mrs. Sartain was seriously mentally ill, but he did not believe that she was suffering from paranoid schizophrenia. He felt that she was able to assist counsel in her defense but that part of her uncooperative behavior resulted from her illness. He did not feel that she was a danger to herself or to others. Dr. Stanley felt that Mrs. Sartain was prone to exaggerate or lie if it served her purpose. He referred to much of Mrs. Sartain's behavior as trial tactics, but he could not explain why she had allowed a default judgment to be taken against her, saying that "she messed up there." He felt that it would be malpractice on his part to authorize a conservatorship, guardianship, or involuntary commitment for Mrs. Sartain.
The court identified the critical questions as whether or not Mrs. Sartain could effectively respond to process, whether she was able to understand what the notice meant, whether she understood her need to be in court, and whether she had an understanding of the nature of the hearing and the consequences of her failure to appear.
"In Mississippi, as elsewhere, the law presumes sanity until the contrary is shown, the burden of proving insanity being upon him who asserts it, as sanity is the normal state." Scott v. United States, 190 F.2d 134, 136 (5th Cir.1951). The court found that while "Mrs. Sartain [was] not a normal woman," and "there may be some mental deficiency," she did have the ability to understand the nature of the proceedings and consequences of her actions pertaining to these proceedings. The finding of fact that Mrs. Sartain was not insane, or non compos mentis, must stand under this Court's manifest error/substantial credible evidence test.
Further, Josephine Sartain moves for relief, apparently under Miss.R.Civ.P. 60(b)(2), (4), and (6). Rule 60(b) states in part:
(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(1) fraud, misrepresentation, or other misconduct of an adverse party;
(2) accident or mistake;
(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;
(6) any other reason justifying relief from the judgment.
The grant or denial of a 60(b) motion is generally within the discretion of the trial court, unless the judgment in question is found to be void. In that case the trial court has no discretion; it must set the void judgment aside. Overbey v. Murray, 569 So.2d 303, 306 (Miss. 1990).
We have stated that, when ruling on 60(b) motions:
a balance must be struck between granting a litigant a hearing on the merits with the need and desire to achieve finality in litigation... . [A] party is not entitled to relief merely because he is unhappy with the judgment, but he must make some showing that he was justified in failing to avoid mistake or inadvertence; gross negligence, ignorance of the rules, or ignorance of the law is not enough.
Stringfellow v. Stringfellow, 451 So.2d 219, 221 (Miss. 1984). Further, the trial court's analysis should include consideration of the following:
(1) the nature and legitimacy of defendant's reasons for his default, i.e., whether the defendant has good cause for default, (2) whether defendant in fact has a colorable defense to the merits of the claim, and (3) the nature and extent of prejudice which may be suffered by the plaintiff if the default judgment is set aside.
*212 King v. King, 556 So.2d 716, 719 (Miss. 1990).
Mrs. Sartain's reason for default, her mental illness, was rejected by the trial court based on credible expert testimony. Mrs. Sartain appears to have no colorable defense to the merits of the claim against her. The Whites have put up with this litigation, which they did not start, for over five years. We find that the lower court was correct in not allowing relief under 60(b)(2).
Sartain further argues that the judgment was void, once again because of her mental condition. Even if insane, Mrs. Sartain could be liable for compensatory damages. Banks v. Dawkins, 339 So.2d 566, 568 (Miss. 1978). Sartain's argument must fail when faced with the trial court's finding on her mental state. The judgment is not void under 60(b)(4).
Relief under Rule 60(b)(6) "is reserved for exceptional and compelling circumstances. It must be based on some other reason than the first five clauses, and it must be some ground which will justify relief from the final judgment." Bryant, Inc. v. Walters, 493 So.2d 933, 939 (Miss. 1986). 60(b)(6) has also been termed a "grand reservoir of equitable power to do justice...." 7 J. Moore & J. Lucas, Moore's Federal Practice ¶ 60.27 2d ed. Recently this Court, in Rich v. Nevels, 578 So.2d 609 (Miss. 1991), denied relief from judgment under 60(b)(6) to a woman claiming to be incompetent. We find no difference in this record which compels a different result.

IV.
Miss.R.Civ.P. 60(b)(3) allows relief from a final judgment where there exists newly discovered evidence which could not have been uncovered in time for trial or in time to move for a new trial. Mrs. Sartain argues that the discovery of her mental condition, ostensibly made by Dr. Whelan during his examination of her on October 30, 1986, qualifies as newly discovered evidence. First, Mrs. Sartain's mental condition in August and September 1986, was open and obvious to anyone who cared to observe it. That Mr. Calhoun was not attorney of record at that time so that a "discovery" of incompetence or insanity could not be made until later will not work to Mrs. Sartain's benefit at this point. Second, the trial court's finding of fact was that Mrs. Sartain may have been mentally ill, or not normal, but she was not incompetent, insane or non compos mentis. Thus it appears that even if this evidence could qualify under 60(b)(3), it would afford Mrs. Sartain nothing at this point.

V.
Sartain argues that, because of her mental illness, she could not provide effective assistance to her attorneys as to any litigation concerning the Whites. She cites no authority in support of this proposition. This argument raises the question as to whether a defendant, even an allegedly incompetent one, is entitled to raise such an argument in civil litigation. There is such a rule in criminal trials, where a defendant "who does not have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or does not have a rational as well as a factual understanding of the proceedings against him" is not competent to stand trial. Gammage v. State, 510 So.2d 802, 803 (Miss. 1987). Obviously, the due process implications are not as great in civil litigation. In addition, if the law is settled in this jurisdiction that an insane person is liable for compensatory damages, see Banks v. Dawkins, 339 So.2d at 568, how else could a judgment be taken against such a person except to sue and take that person to court? There appears to be no exception here, even for someone so deranged as to be of no help to counsel. Miss.R.Civ.P. 17(c) allows for the appointment of guardian ad litem for those under a legal disability. Surely there are times when the legal disability is so severe that optimum or beneficial communication between the guardian and the party is nonexistent. It does not appear that this means that an action cannot be filed or a judgment cannot be taken against such a party.
*213 Even if a standard such as that in Gammage is applicable, Mrs. Sartain once again is stymied by the trial court's finding of fact as to her mental condition. We are bound by our standard of review to uphold the trial court's finding that Mrs. Sartain is competent.

VI.
Josephine Sartain finally argues certain jury instructions were erroneously granted by the trial court, instructions which allegedly "establish[ed] liability for defamation without fault." There are procedural problems with this issue: no objection was made in the trial court, except for a similar issue included in the motion for new trial; the allegedly offending jury instructions are not named; no authority is cited, except for the single word Gertz, apparently a reference to Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Gertz held that the First Amendment prohibited awards of presumed and punitive damages for defamation of a private figure unless the private individual/plaintiff could show "actual malice," which is knowledge on behalf of the defendant that the defamatory statement is false, or reckless disregard for whether it was true or false.
Gertz was followed by Dun & Bradstreet v. Greenmoss Builders, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), which involved a defamation suit by Greenmoss Builders, a construction contractor, against Dun & Bradstreet, a credit reporting agency, which had circulated a false credit report about Greenmoss. Greenmoss received presumed, or compensatory, and punitive damages as a result of a jury trial. The trial court subsequently granted a new trial, believing that Gertz applied. On appeal, the Vermont Supreme Court reversed, holding that Gertz did not apply to cases involving nonmedia defendants. The Supreme Court affirmed in a plurality opinion, but for different reasons. It found that there was no First Amendment prohibition on awarding presumed and punitive damages absent a showing of actual malice where the defamatory statements did not involve matters of "public concern." Whether speech deals with a matter of public concern is determined by the speech's content, form and context. Dun & Bradstreet, 472 U.S. at 761-62, 105 S.Ct. at 2946-47, 86 L.Ed.2d at 604-05.
The point of this discussion is that the jury which awarded the Whites $600,000.00 in compensatory and punitive damages was instructed that the words written by Josephine Sartain were libelous per se and that the Whites did not have to prove actual malice to recover against Mrs. Sartain. The jury would then appear to be instructed incorrectly if the subject matter of the defamation could be labeled a matter of "public concern." In Staheli v. Smith, 548 So.2d 1299, 1304-05 (Miss. 1989), we found that a controversy over a university professor's denial of tenure was not a matter of public concern.
The content of the debate in question involves whether the Whites are murderers, robbers and terrorists. The form of the debate involved various pleadings, letters to city officials, and oral tirades within a neighborhood. The context of the debate involves a dispute between a respectable family as the accused and an accuser with a rather notorious past. Though accusations of this nature generally are a matter of public concern, in this context and emanating from this source, we find that they are not in this case.
Our courts have not dealt hastily nor harshly with Josephine Sartain. The courts and the Whites tried to avoid the results at hand but as this Court said on an earlier occasion, "This was hardly Sartain's maiden judicial voyage."
Josephine Sartain used, misused and played litigation games until she lost the game; yet, it is difficult to say that the plaintiffs won. Surely, they did not win more than they were entitled to, and we may be certain that the courts were patient and careful in hearing Josephine Sartain.
Because the law supports it, and also because we have no other alternative, we hopefully, finally, put this litigation to an end. The judgment of the circuit court is affirmed in all respects.
AFFIRMED.
*214 ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
HAWKINS, P.J., not participating.
NOTES
[1] Doyle Sartain passed away on April 7, 1985.
[2] As this Court stated on an earlier occasion, "[t]his was hardly Sartain's maiden judicial voyage." See, e.g., Sartain v. City of Water Valley, 528 So.2d 1125 (Miss. 1988); Sartain v. Caulfield, 465 So.2d 999 (Miss. 1985) (memorandum of decision); Sartain v. State, 406 So.2d 43 (Miss. 1981); Sartain v. White, 388 So.2d 884 (Miss. 1980) (memorandum of decision); Sartain v. Sanders, 358 So.2d 1327 (Miss. 1978) (memorandum of decision); and Sanders v. Sartain, 353 So.2d 1144 (Miss. 1978) (memorandum of decision).