33 So.3d 480 (2009)
George E. TRIM, Appellant,
v.
Lisa Mosley TRIM, Appellee.
No. 2007-CA-01648-COA.
Court of Appeals of Mississippi.
April 21, 2009.
Rehearing Denied August 18, 2009.
*481 William Lee Colbert, Jackson, attorney for appellant.
Randall Harris, Kimberly Pine Turner, attorneys for appellee.
EN BANC.
ROBERTS J., for the Court.
¶ 1. Lisa Trim (Lisa) filed a petition to set aside a final judgment of divorce and property settlement agreement. She asserted that her ex-husband, George Trim (George), had fraudulently understated the value of his assets in his Uniform Chancery Court Rule 8.05 statement during their divorce proceeding. The chancellor agreed and found that George had fraudulently listed the value of his company stock and awarded Lisa half of its value. George now appeals the chancellor's ruling arguing that: (1) Lisa's motion was untimely, and (2) he did not fraudulently list the value of his company stock. A thorough review of the record and applicable case law reveals that the chancellor erred when he failed to treat Lisa's claim as untimely and when he treated her petition to set aside the final judgment of divorce and/or property settlement agreement as a motion to modify a property settlement *482 agreement. Accordingly, we reverse and render.

FACTS AND PROCEDURAL HISTORY
¶ 2. On November 16, 1990, George and Lisa were married in Hinds County, Mississippi. No children were born to the marriage. Over the course of their marriage, Lisa worked as a sales representative for the Berry Company selling yellow page advertisements, and George was self-employed in a computer networking and cabling business, Business Communications, Inc., (BCI). In 1993, George and Tony Bailey (Bailey) partnered to form (BCI), which is a closely-held subchapter S for profit corporation. Bailey owned fifty-one percent of the stock, with George owning a minority share of forty-nine percent.
¶ 3. George and Lisa continued to live as husband and wife until their separation in September 1999. Around the time of their separation, George and Lisa discussed their financial status. George thought that the value of his stock in BCI was worth $100,000, and Lisa owned a retirement account valued at $120,000. The equity in George and Lisa's home was $30,000. George proposed that Lisa keep her retirement account; he keep his BCI stock and their home; and he pay Lisa $5,000 to make up the difference. In essence, the couple divided their marital assets equally. After this, on September 24, 1999, Lisa signed a property settlement agreement reflecting the couple's decision.
¶ 4. George and Lisa did not file for divorce until seven months later. On April 10, 2000, George and Lisa filed a Joint Complaint and Consent to Divorce based on irreconcilable differences. They also attached the above property settlement agreement to their complaint. Pursuant to Uniform Chancery Court Rule 8.05 (hereinafter 8.05), each party submitted a financial statement of their assets and liabilities to the court. In his 8.05 statement, George again listed the value of his BCI stock at $100,000. On June 14, 2000, the Hinds County Chancery Court entered a final judgment granting a divorce to George and Lisa and ratified the property settlement agreement attached in the divorce complaint.
¶ 5. Following the divorce, in 2001, the business relationship between George and Bailey began to deteriorate. In July 2001, at a board of directors' meeting, Bailey and a third director voted to fire George as president of the company and reduce his management responsibilities and salary. As a result of being "squeezed out" of the company, George filed suit against Bailey and BCI alleging breach of fiduciary duty and wrongful breach of minority rights. He sought to have the company dissolved. Pursuant to statutory requirements, the Madison County Chancery Court held a hearing to determine the value of George's BCI stock, and the court determined that the better result, rather than to dissolve the company, was to have BCI pay George for his stock and for George to relinquish any rights in BCI. The stock valuations presented in that hearing spurred the present litigation between Lisa and George.
¶ 6. During the litigation between George and Bailey, each party presented expert testimony to determine the value of George's stock, and the chancellor adopted George's expert's finding that the stock was worth $1,186,000 as of August 14, 2001. During the Trim v. Bailey[1] litigation, the chancellor expressed dissatisfaction *483 with the determined values because of the disparity of findings between the parties' experts. However, due to the parties' unwillingness to hire a third expert, he felt bound to choose one of the amounts, so he chose the higher value. It is clear that difficulty existed in placing a definitive monetary value on the stock. Rather, determinations were based on numerous factors that were not easily discernible and resulted in vastly different valuations.[2]
¶ 7. Lisa waited until November 19, 2004, to file suit against George claiming that he had fraudulently misrepresented the value of his stock when they were discussing their property settlement agreement over five years earlier in September 1999. In the Trim v. Trim[3] litigation, Lisa hired a third expert, which presented yet another opinion concerning the value of George's stock. Lisa's expert valued George's stock at $694,000 at the time of George and Lisa's divorce. The chancellor accepted this opinion and awarded Lisa 25% of this amount. In other words, Lisa received an additional $148,000 plus attorneys' fees and costs. The judgment from that litigation is now the subject of this appeal.

STANDARD OF REVIEW
¶ 8. This Court has established:
The standard of review by this Court in domestic relations cases is well-settled. Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court was manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard. However, we will not hesitate to reverse should we find that a chancery court was manifestly wrong, abused its discretion, or applied an erroneous legal standard.

Pulliam v. Smith, 872 So.2d 790, 793(¶ 5) (Miss.Ct.App.2004) (internal citations omitted) (emphasis added).

I. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN FINDING GEORGE'S CONDUCT TO BE FRAUDULENT.
¶ 9. Although the chancellor believed that George had "wilfully, knowingly, and fraudulently undervalued his income and the value of 49% stock in Business Communications, Inc.," the record does not fully support that determination. "Fraud is `a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment.'" Mitchell v. Nelson, 830 So.2d 635, 639(¶ 13) (Miss. 2002) (quoting Black's Law Dictionary 670 (7th ed.1999)). "Additionally, the elements of fraud must be prove[n] by clear and convincing evidence." Id. at 639(¶ 13). As the Mississippi Supreme Court has recited:
The elements of fraud, which must be proven by clear and convincing evidence, include: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; 5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) his reliance on its truth; 8) his right to rely thereon; and 9) his consequent and proximate injury.
In re Estate of Law, 869 So.2d 1027, 1029(¶ 4) (Miss.2004).
*484 ¶ 10. It is not entirely clear from the record that George knowingly misrepresented the truth to Lisa regarding the value of his stock, nor is it entirely clear that Lisa had a right to rely on George's opinion. As stated, the record reveals that during the litigations following George and Lisa's divorce, three different experts valued George's stock with a low of $111,000 and a high of $1,186,000. There is no consensus concerning the value of George's stock in BCI. In order to find that George fraudulently misled Lisa, it must be shown that he knew that his stated value of the stock was wrong, and that he intended for Lisa to rely on a false representation. Also, it must be shown that Lisa was ignorant of any misrepresentation by George. It is not evident from the record that the elements of fraud have been met. First, we will address George's representation of his stock's value, and second, we will address Lisa's naivete, or the lack thereof, in her acceptance of George's belief concerning the value of his BCI stock.
¶ 11. In determining that George had misrepresented the value of his stock, the chancellor seemed to place great emphasis on a 1999 financial statement that George signed prior to the divorce. The financial statement was prepared in order to maintain a revolving line of credit for the company, and the company submitted such financial statements for George and Bailey each year. On George's financial statement, it was stated that the value of the stock was $1,100,000. Obviously, this amount is in stark contrast to George's personal estimation given in his 8.05 financial statement.[4] However, uncontradicted testimony by George reveals that the personal financial statement, which was presented to the bank, was not completed by him, but rather by BCI office personnel in order to renew BCI's revolving line of credit; he simply signed it. George testified that he signed it even though he thought it was incorrect. There is no way to know for certain whether this account is accurate. However, when attempting to discern the veracity of George's testimony, which was that he merely signed off on the forms prepared by others, it is relevant to note that George was relatively uneducated and quit school at the age of sixteen.[5]
¶ 12. George also testified that he did not believe that the stock was worth what the 1999 financial statement stated when he and Lisa discussed the property settlement agreement and later when he completed his 8.05 financial statement. He thought it was only worth about $100,000 because of the significant changes that occurred within the company during 1998 and 1999. During that time, the company lost two of its owners, completed a major project for which it had not been paid, lost and hired employees including a new chief financial officer, and purchased a new software company. Considering that George only had "sweat equity" in the company and a limited education, it is quite conceivable that he was not systematically trying to defraud Lisa; rather, he merely left the financial workings of the company to his partner, Bailey, and other office personnel.[6] *485 George's testimony about his belief regarding his stock's value is not that far-fetched considering that three different qualified experts assessed three distinct and widely divergent valuations ranging from $111,000 to $1,186,000. We are hard pressed to conclude that the evidence is convincing that there was an intentional fraudulent scheme perpetrated by George upon Lisa.
¶ 13. Second, we address Lisa's naive reliance on George's representation concerning his stock's value. Lisa claimed that she simply depended on George's opinion and that she was ignorant of the workings or intricacies of the business that she and George had been involved in since 1993, six years prior to the divorce. Lisa's own testimony casts doubt upon this claim.
¶ 14. Lisa testified that she was involved in BCI by "sign[ing] financial documents, performance bonds, [and] helping [George] interview people." Furthermore, she testified that she hosted parties for the company, traveled with him on business, and performed "walk-throughs" for jobs in Colorado and Las Vegas.[7] When asked if she considered herself working for BCI, she distinctly stated that "[she] was there on work." Lisa signed surety bonds for BCI and acknowledged that she was aware that by signing such bonds, she had the risk of "los[ing] everything." On one hand, she claimed to work at and be very involved with the company; while on the other hand, she claimed to barely know George's partner or any details surrounding the closely-held company. It is unclear exactly where the truth lies. Although the extent of her involvement may be debatable, there are no facts in the record to support a belief that Lisa was denied access to BCI and the financial information related to George's stock or that such information was hidden from her. Rather, she simply declined to pursue the information.[8]
¶ 15. Considering these facts and the reality of Lisa's involvement in the business, it is questionable that three of the nine elements of fraud are met. These are: the speaker's knowledge of its falsity or ignorance of its truth; the hearer's ignorance of its falsity; and the right to rely thereon. The record reveals that Lisa is a competent person with adequate business acumen. In addition to Lisa's account of her involvement with BCI at the time of the divorce and subsequent litigation, she had been an employee of the Berry Company, which sells Yellow Page advertising, for nearly two decades. Due to her success, she achieved an income of nearly $100,000 per year. Furthermore, Lisa testified that when they were dissolving their marriage and determining who would keep the home and so forth, "[she and George] sat down and figured up [what] George's stock was worth." Lisa testified that the reason for this was "to go ahead and get the divorce."[9] George's involvement with BCI was not hidden from Lisa, nor was she a stranger to those *486 involved with the company. Before agreeing to the property settlement agreement and no fault divorce, if Lisa had any genuine doubts about George's estimate of the value of his stock, she could have refused to execute the property settlement agreement or to get the divorce; she and George could have agreed to have the value of his stock determined by an appraiser or by the chancellor; she could have demanded financial records from BCI before deciding; or she could have taken other such appropriate action. She simply chose not to do so.
¶ 16. Although the facts place genuine doubt upon a legitimate fraud claim, we are not prepared to conclude, and do not find it necessary to decide, that the chancellor erred when he found fraud. Rather, the determinative issue is whether Lisa's petition was timely under Rule 60(b), and whether the chancellor erred when he decided to consider Lisa's petition to set aside the divorce and property settlement agreement as a motion to modify the property settlement agreement instead. The clear language of the rules and established case law mandate a finding that Lisa's petition was time-barred; therefore, the chancellor was incorrect in his decision to modify the property settlement agreement.

II. WHETHER LISA'S MOTION TO SET ASIDE THE DIVORCE AND PROPERTY SETTLEMENT AGREEMENT WAS TIMELY FILED.
¶ 17. Rule 60(b) of the Mississippi Rules of Civil Procedure provides in part:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(1) fraud, misrepresentation, or other misconduct of an adverse party;
(2) accident or mistake;
(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
. . . .
(6) any other reason justifying relief from the judgment.
The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than six months after the judgment, order, or proceeding was entered or taken."
M.R.C.P. 60(b) (emphasis added). Lisa's petition, the chancellor's opinion, and established case law all reveal that Lisa's claim falls squarely under Rule 60(b)(1) and is, therefore, time-barred.
¶ 18. The chancellor stated in his order and opinion that Lisa learned of the different stock valuation in 2002 and that she sought legal counsel in the same year. However, she did not file her petition until November 2004. Lisa claims that she hired two attorneys who failed to take action against George before she finally found an attorney who filed suit nearly four and one-half years after the final judgment of the divorce.[10] Consequently, she missed her six-month window of opportunity to file her claim for fraud pursuant to Rule 60(b)(1). As this Court stated in Tirouda v. State of Mississippi, 919 So.2d 211, 214(¶ 8) (Miss.Ct.App.2005), "[f]raud upon an adverse party falls under Rule 60(b)(1) which requires that motion be made in a reasonable time and not more *487 than six months after the judgment, order, or proceeding was entered or taken."
¶ 19. Because the chancellor found George's conduct egregious, he utilized Rule 60(b)(6) to fashion a remedy for Lisa. Although Rule 60(b)(6) provides a "catch-all" provision, which may be granted in exceptional circumstances, it simply does not apply to the case at hand. First of all, an attorney's failure to file a petition timely is insufficient to qualify as an extraordinary or compelling circumstance, and second, "[u]se of Rule 60(b)(6) must be based on some reason other than the first five enumerated clauses of the rule." Mitchell, 830 So.2d at 639(¶ 9) (emphasis added). Clearly, Lisa's fraud or misrepresentation claim falls squarely within Rule 60(b)(1). Therefore, Rule 60(b)(6) is not an available remedy for her.
¶ 20. In support of his decision, the chancellor relied on Kalman v. Kalman, 905 So.2d 760 (Miss.Ct.App.2004), but Kalman is factually dissimilar to the instant appeal. In Kalman, neither the husband nor the wife had signed an 8.05 financial statement, and the undisclosed information related to the husband's purchase of a lottery ticket and undisclosed winnings of $2,600,000 about a month prior to the couple filing for divorce and about four months prior to the final divorce decree being entered. Id. at 761(¶ 1). The instant matter does not deal with something as bizarre as a litigant winning the lottery one month prior to divorce and hiding his winnings from his spouse and the court. Rather, this case involves a business in which Lisa was actively involved with readily discoverable financial information. Lisa could have easily discovered the 1999 financial information, as well as any other financial documents related to BCI, prior to the divorce had she chosen to do so.
¶ 21. If George had perpetrated a fraud upon the court,[11] there would be no limitation of time for the court to pursue a remedy, other than a reasonable one. See, Tirouda 919 So.2d at 214(¶ 8). In Tirouda, where the defendant employed numerous witnesses to deceive the court in order to acquire a fraudulent birth certificate, this Court stated that "fraud upon the court falls within the savings clause of [Rule] 60(b) and is not subject to time constraints." Id. The instant case is distinguishable. Realizing that Lisa was outside the time limitations imposed by Rule 60(b), the chancellor accurately stated, "the issue I have got to decide is if [George] perpetrated fraud on the Court." However, the chancellor, clearly found that George's actions did not "rise to the level of `fraud upon the court.'" Despite this realization and the fact that the six-month time period had run on Lisa's fraud claim, the chancellor decided to consider Lisa's petition to set aside the divorce and property settlement agreement as a petition to modify the decree and gave her "less than. . . [she] originally prayed for." Obviously, the chancellor sought to achieve what he perceived as the "right" or "equitable" result, but that result was in contradiction to established law. The chancellor was manifestly wrong in this decision.
*488 ¶ 22. Although Rule 60(b) provides a chancellor with a "grand reservoir of equitable power to do justice in a particular case,"[12] "a true and genuine property settlement agreement is no different than any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated into a divorce decree, does not change its character." Lowrey v. Lowrey, 919 So.2d 1112, 1120(¶ 31) (Miss. Ct.App.2005) (quoting West v. West, 891 So.2d 203, 210(¶ 13) (Miss.2004)). Furthermore, the Mississippi Supreme Court has stated, "parties may upon dissolution of their marriage have a property settlement agreement incorporated in the divorce decree, and such property settlement agreement is not subject to modification." Townsend v. Townsend, 859 So.2d 370, 376(¶ 21) (Miss.2003) (emphasis added).
¶ 23. As this Court has stated, "the law favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the Agreement which the parties have made, absent any fraud [or] mistake. . . ." Lowrey, 919 So.2d at 1120(¶ 30). To reiterate, even if there was fraud or misrepresentation on George's part, case law and Rule 60(b) make it clear that any claim must be filed within six months. Although a chancellor has great equitable powers, it is not within his or her authority to circumvent the mandate of firmly established case law by merely calling a contract by another name or by trying to mold a claim so that it will fit within the parameters of different rule.
¶ 24. In a similar case in which an ex-wife claimed fraud or misrepresentation on financial statements, this Court held that "[m]ere perjury is not ground for a collateral attack on a judgment of divorce." Brown v. Estate of Johnson, 822 So.2d 1072, 1073(¶ 4) (Miss.Ct.App.2002). As already stated, it is plausible that George simply did not know for sure what his stock was worth, but at worst, it was fraud or misrepresentation upon Lisa. Therefore, it is clearly governed by Rule 60(b)(1). This Court has previously recognized that Rule 60(b) may create a tension between equity and finality. The Brown Court reflected:
Rule 60(b) deal[s] with two concepts that tug in opposite directions. . . . that, human nature being what it is . . . parties. . . will misrepresent facts and swear falsely under circumstances, which will lead [their] actions to be difficult to discover contemporaneously with the event. . . . [But], at some point, there must be finality to litigation. Rule 60(b)(1) deals with these competing considerations by . . . providing a window of opportunity in the post-judgment period, albeit a relatively narrow one, for a party to discover and act. . . .
Brown, 822 So.2d at 1074(¶ 5).
¶ 25. The dissent fully illuminates this tension that Rule 60(b)(1) creates, and interprets our ruling as applauding fraudulent conduct by one spouse upon another. This could not be further from the truth. Certainly, we encourage full and honest disclosure by parties, especially within a marriage. However, we cannot dismiss our rules nor ignore the law because we perceive that a chancellor has a "grand reservoir of power" to permit such a ruling. It is incumbent upon parties in litigation to seek discovery when any doubt exists about the true facts. Additionally, at some point, litigation must end. The dissent correctly states, it is the chancellor who hears the testimonies of witnesses and observes their demeanor, but that does not equip him or her with the power to disregard clear rules based upon his or her own *489 opinion or whim. The purpose of our laws is to provide guidance, order, and finality. A chancellor's grand reservoir of power is not an infinite power. The dissent perceives our adherence to the rules as substituting our judgment for that of the chancellor, but, even with reservations, we have declined to find that the chancellor erred when he found that George had committed fraud upon Lisa. The chancellor's ruling relating to Lisa's fraud claim does not preempt Rule 60(b)(1). Rule 60(b)(1) clearly requires that any claim of fraud upon a party to litigation must be brought within six months after the judgment, and such a claim does not fall within the "catch-all" Rule 60(b)(6). As stated in Tirouda, "this Court is without authority where Rule 60(b)(1), (2), or (3) is the basis for an action and the motion is brought beyond the six-month limitation." Tirouda, 919 So.2d at 214(¶ 8).
¶ 26. As harsh as it may seem, Lisa's claim is time-barred according to Rule 60(b)(1). Accordingly, by allowing Lisa to succeed on an untimely claim, the chancellor applied an erroneous legal standard. Hence, our standard of review requires that we reverse the chancellor's ruling and render judgment for George.
¶ 27. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, P.J., GRIFFIS, BARNES AND CARLTON, JJ., CONCUR. MYERS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J., IRVING AND ISHEE, JJ. MAXWELL, J., NOT PARTICIPATING.
MYERS, P.J., Dissenting.
¶ 28. I disagree with the majority's decision to reverse and remand the chancellor's judgment to modify the Trims' property agreement. Given our standard of review and the equitable principles that are the basis of the chancery court's decisions, I conclude that the record provides sufficient evidence to support the chancellor's modification. The majority declines to take a stand on whether George committed fraud and completely disregards the equitable principles that are the cornerstone of the chancery court and its decisions. Therefore, I must dissent.
¶ 29. The majority cited the elements of fraud, which I firmly believe were met in the present action. During conversations regarding their property settlement agreement, George told Lisa that his BCI stock was worth only $100,000. He reaffirmed this assertion by valuing his BCI stock at $100,000 in his 8.05 statement.
¶ 30. Contrary to the value representation made to Lisa and in his 8.05 statement, George had valued his BCI stock over $1,000,000 on two separate occasions. BCI had a revolving line of credit at State Bank and Trust. Each year, State Bank required BCI to submit the personal financial statements of George Trim and Tony Bailey. On December 22, 1999, George submitted his yearly personal financial statement to State Bank. In it, he valued his BCI stock at $1,100,000. This is in stark contrast to the $100,000 he represented to Lisa three months prior. Again on December 31, 2000, George represented to State Bank that his BCI stock was worth more than a million dollars. This time he valued his BCI stock at $1,837,500. This was only five months after he submitted his 8.05 statement valuing his stock at $100,000. From these actions, George clearly knew his BCI stock was worth more than the $100,000 he represented to Lisa and the chancery court. The majority fails to assign any weight to these financial statements. In doing so, it disregards the long-standing principle in Mississippi *490 contract law that "a person cannot avoid a written contract which he entered into on the ground that he did not read it or have it read to him." Dunn v. Dunn, 786 So.2d 1045, 1050 (¶ 17) (Miss.2001).[13] Accordingly, George committed fraud either in his 8.05 statement or in his financial statement to State Bank.
¶ 31. During the BCI/Trim case, George's own expert valued George's BCI stock near the amount given to State Bank.[14] This finding leads me to concluded that the value given to State Bank was the correct value and that George knew that the $100,000 figure given to Lisa was false.
¶ 32. Lisa testified that during their marriage and separation George never indicated that his BCI stock was worth anything near $1,000,000. The couple discussed the stock value only during their property settlement talks. Lisa further testified that she did not have the means of definitively ascertaining the value of his stock because of her relationship with BCI employees. Given these facts, it is evident that Lisa had to rely on George's statement regarding the value of his BCI stock, and he intended for her to do just that.
¶ 33. Lastly, Lisa would not have been deprived her right to an equitable distribution if George had honestly represented the value of his BCI stock. BCI was created during the Trims' marriage and unquestionably is marital property. It can be assumed that neither Lisa nor the chancellor would have agreed to the terms the divorce as it stood if George would have correctly stated the value of his BCI stock. Lisa would have received a greater portion in distribution if George would not have falsely stated his stock's value. Thus, Lisa was injured by George's conduct.
¶ 34. It is clear from these facts that George's conduct rose to the level of fraud. He knowingly and purposefully misrepresented the value of his BCI stock to Lisa with the intention of preventing her from receiving her equitable portion of his stock value. Lisa relied on these statements, causing her to receive less than her legal entitlement. Accordingly, I find more than sufficient evidence to conclude the chancellor find not err in finding that George committed fraud when he listed the value of his BCI stock.
¶ 35. The majority finds that the six-month limitation in Rule 60(b)(1) must be strictly complied with, regardless of the facts. I do not agree. The Mississippi Rules of Civil Procedure must be read in conjunction with the equitable principle of our chancery court. I find the most equitable result would be to allow Lisa to receive the value of BCI stock she is due, and thus, affirm the chancellor's modification.
¶ 36. Mississippi Rule of Civil Procedure 60(b)(6) permits the court to relieve a party from a final judgment for any reason justifying relief from the judgment. It has been described as a "grand reservoir of equitable power to do justice in a particular case." M.A.S. v. Miss. Dep't of Human Servs., 842 So.2d 527, 530(¶ 12) (Miss. 2003) (quoting Briney v. U.S. Fid. & Guar. Co., 714 So.2d 962, 966(¶ 12) (Miss.1998)). "The broad language of clause (6) gives the courts ample power to vacate judgments *491 whenever such action is appropriate to accomplish justice." Harrell v. DCS Equip. Leasing Corp., 951 F.2d 1453, 1458 (5th Cir.1992). Relief under this rule "is reserved [only] for exceptional and compelling circumstances". Hartford Underwriters Ins. Co. v. Williams, 936 So.2d 888, 893(¶ 14) (Miss.2006) (quoting Sartain v. White, 588 So.2d 204, 212 (Miss.1991)). A motion under Rule 60(b)(6) must be brought "within a reasonable time."
¶ 37. Occasionally, we must look to the federal cases for guidance, since the Mississippi Rules of Civil Procedure were patterned after the Federal Rules of Civil Procedure. White v. Stewman, 932 So.2d 27, 39(¶ 34) (Miss.2006). In Lowe v. McGraw-Hill Cos., 361 F.3d 335, 343 (7th Cir.2004), the court allowed the petitioner to proceed under Federal Rule 60(b)(6), even after the time limitation had expired, because the petitioner could not have reasonably discovered the mistaken default judgment and moved to set it aside within the time restriction. That court went on to state that in typical "extraordinary" cases, there is no way the movant could have discovered the ground for doing so within the time limitation provided. Id. at 342-43.
¶ 38. This case is synonymous to Lowe in that Lisa could not have discovered the value of George's BCI stock within the time limitation provided in Rule 60(b)(1). The majority theorizes that Lisa could have "easily discovered" information that would have provided her with the value of BCI's stock within six months after their divorce, which is contrary to the testimony given at the modification hearing. Lisa testified that it would have been very difficult for her to ascertain the value of George's BCI stock during their divorce. The only people privy to that information were George, Bailey, and a secretary at BCI. Lisa testified that she did not have a cordial relationship with either Bailey or the secretary at the time of her divorce, which caused her to rely on George's assessment of the value of his BCI stock. I feel the majority's assessment is nothing more than a substitution of their judgment in place of the chancellor's, which the supreme court has sternly warned against doing. See In re Extension & Enlarging of Boundaries of the City of Laurel, 922 So.2d 791, 796(¶ 9) (Miss.2006) ("We must resist the temptation to substitute our judgment for that of a Chancellor, even though we may have found otherwise, had any one of us been the trial judge").
¶ 39. The combination of George's conduct and Lisa's relationship with BCI personnel prevented her from discovering the real value of George's BCI stock for more than one year after their divorce, well outside the six-month limitation provided in Rule 60(b)(1). Because Lisa could not have discovered the value of George's BCI stock within the time limitation provided, this is an "extraordinary situation" under the rule. Thus, Rule 60(b)(6) should be applied rather than Rule 60(b)(1). Accordingly, I feel the chancellor did not err in allowing Lisa to pursue her claim under Rule 60(b)(6), given that she filed her motion within a reasonable time.
¶ 40. Upon discovering the true value of George's BCI stock, Lisa retained an attorney. However, this attorney failed to work on this case for six to eight months. She contacted a second attorney, who investigated the case for several months, then declined to accept it. Lisa is presently on her third attorney in this case. Given the dilatoriness of her previous attorneys and the time period in which she filed the motion, the chancellor could have found that Lisa brought the present action within a reasonable time. Therefore, because it is an extraordinary situation and Lisa brought her action within a reasonable *492 time, she could have filed this action under Rule 60(b)(6).
¶ 41. It is my opinion that the majority is interpreting our Rules of Civil Procedure in a vacuum. Our supreme court has reminded us to "keep in mind the equitable purpose of Rule 60 as well as the spirit by which procedural rules must be interpreted." Tirouda, 919 So.2d at 216(¶ 9) (Miss.Ct.App.2005) citing Accredited Sur. & Cas. Co. v. Bolles, 535 So.2d 56, 59 (Miss.1988). "The primary purpose of our Rules of Civil Procedure is to `secure the just ... determination of every action' and `promote the ends of justice.'" Id. It is unquestionable that George's BCI stock was marital property because BCI was formed during the Trims' marriage. In reversing and remanding the chancellor's ruling, the majority would permit George to keep the full value of his BCI stock despite the fact that George knowingly misrepresented the value of his BCI stock to his wife in their property settlement agreement. In doing so, it would prevent Lisa from receiving the portion of BCI stock that she is legally entitled to receive in equitable distribution. The majority's result applauds George's fraudulent conduct and promotes less than full disclosure between spouses during their marriage and upon divorce. It encourages trickery and deceitfulness between spouses, as long as it can be hidden for six months after a final judgment of divorce is entered. How can this be fair and just?
¶ 42. The equitable result would be to allow Lisa to receive the portion of BCI stock she is legally entitled to, thus, affirming the chancellor's ruling that "equity demands" the property settlement agreement be modified.
¶ 43. As stated earlier, this Court has a very limited and deferential standard of review regarding a chancellor's decision. Shelby, 802 So.2d at 92(¶ 11). "It is our solemn duty to afford due deference to a Chancellor, who sits as the fact finder." In re Extension & Enlarging of Boundaries of the City of Laurel, 922 So.2d at 795(¶ 7). A chancellor, being the only one to hear the testimonies of witnesses and observe their demeanor, is in the best position to judge their credibility. Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983). In the present action, there is substantial, credible evidence throughout the record to support the chancellor's ruling. It is clear that George fraudulently listed the value of his BCI stock in his 8.05 statement. Because Lisa could not have discovered the true value of George's BCI stock within the six-month period provided in Rule 60(b)(1), it constitutes an extraordinary situation under Rule 60(b)(6), which provides Lisa a reasonable time to bring her action. I would find that Lisa did bring her action within a reasonable time under Rule 60(b)(6) due to previous attorneys' dilatoriness. Accordingly, the chancellor did not err in allowing Lisa to bring her action more than six months after the final judgment in her divorce. Given the substantial, credible evidence to support the chancellor's finding and our deferential standard toward his ruling, I find the chancellor did not err in modifying the Trims' property settlement.
¶ 44. For these reasons, I respectfully dissent.
KING, C.J., IRVING AND ISHEE, JJ., JOIN IN THIS OPINION.
NOTES
[1] Trim v. Business Communications, Inc. and Tony Bailey, Civil Action No. 2001-695, was filed in the Chancery Court of Madison County, Mississippi. A final judgment was rendered on June 6, 2002.
[2] Factors to be considered in valuing the stock in a closely-held corporation include the lack of marketability and lack of control discounts.
[3] Trim v. Trim, Cause No. G2000-684 R/1, was filed in the Chancery Court of the First Judicial District of Hinds County, Mississippi. Final judgment was rendered on July 3, 2007.
[4] The property settlement agreement does not reflect the value of George's BCI stock, only the 8.05 financial statement does.
[5] The dissent accuses the majority of excusing George because he is "relatively uneducated," and opines that it "does not take an advanced educational degree to tell the difference between $100,000 and over $1,000,000." This view minimizes the complexities involved in discerning a true valuation of stock in a closely-held corporation. It is not clear from the record that George knew conclusively that his stock was worth what was listed on the financial statements.
[6] George also testified that between 1993 and 2000 that a secretary of BCI, Shirley Wilson, paid all of his payments because of his travel.
[7] Lisa even admits that she and George conspired for her to distract an inspector at one of the job sites, so that the inspector would not notice subpar workmanship.
[8] Lisa claims that she was not cordial with BCI personnel, and because of that, she was precluded from attaining any information from them. However, parties involved in litigation, whether a divorce or other type lawsuit, may obtain discovery from others with whom they are not cordial all the time. A lack of cordiality is not an excuse for a lack of diligence.
[9] The record shows that Lisa married again about a month after her divorce from George.
[10] There is nothing in the record that explains why the first two attorneys did not bring the suit, but perhaps it was because they recognized that the six-month window of opportunity had already closed and refused to accept Lisa's case because they believed pursuit of her claim would prove to be fruitless.
[11] "Fraud on the court . . . is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court." Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985) (citation omitted). A motion based upon fraud on the court must be brought within a reasonable time. Walton v. Snyder, 984 So.2d 343, 350-51 (¶¶ 21-23) (Miss.Ct. App.2007). Fraud on an adverse party is found where only one witness commits perjury. Tirouda, 919 So.2d at 216(¶ 12). Unlike fraud on the court, fraud on an adverse party is subject to the six-month time restraint.
[12] See, Briney v. U.S. Fid. & Guar. Co., 714 So.2d 962, 966(¶ 12) (Miss.1998).
[13] The majority also attempts to justify George listing his BCI stock at two different value by stating that George was "relatively uneducated." I find this unpersuasive as it does not take an advanced educational degree to tell the difference between $100,000 and over $1,000,000.
[14] This was in addition to Tony Bailey offering George $1,000,000 for his BCI stock in 2000, and another BCI board member offering George $1,500,000 in late 2000 for his BCI stock.