******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom ZARELLA, J., joins, dissenting. I respectfully dissent. Free speech may not be invoked as a mere contrivance to shield tortious conduct—directed at a private party on a purely private matter—from liability. See *Snyder* v. *Phelps*, 562 U.S. 443, 455, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011). In my view, the majority accepts a contrived, post hoc rationalization for the harassing conduct by the defendants, Janice Smolinski and Paula Bell,[1] allowing a hollow invocation of the first amendment to the United States constitution in order to protect conduct not deserving of its aegis. I remain dedicated to safeguarding free speech, the hallmark of which "is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting." (Internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 448, 97 A.3d 946 (2014). As the trial court's findings demonstrate, however, no protected ideas were intended to be expressed by the defendants in continuously bombarding the plaintiff, Madeleine Gleason,[2] with flyers at her residence and place of employment. Instead, the trial court found that "what is unacceptable here and worthy of a finding of outrageous and extreme behavior is the continuing aggravated nature of the [defendants'] activity in hounding [the plaintiff] where she lived and worked and engaged in the ordinary activities of life. . . . Posters of a missing person were placed so as to indicate to [the plaintiff] that the very purpose of the poster campaign was to underline her supposed knowledge of the criminal disappearance of [William Smolinski, Jr. (Bill)]."[3] (Citation omitted.) The trial court further concluded: "[T]he [plaintiff's] emotional distress . . . was severe. She, in effect, felt she was being constantly hounded—not as the result of a general effort by the [defendants] to find their son and brother but part of an effort to break her. . . . [T]he defendants would not be satisfied unless [the plaintiff] admitted to what they were convinced she knew and they pursued their action with these purposes in mind." Respectfully, only by overturning these factual findings—and making a new finding that "the targeted content and location was consistent with the overarching public concern of gaining information about Bill's disappearance"—can the majority justify the conclusion that the defendants' conduct merits the first amendment's protections. The majority does so notwithstanding the fact that, at oral argument, the defendants conceded that they were not asking this court to overturn any of the trial court's factual findings. See footnote 4 of this dissenting opinion.

In light of the standard of review we must apply today, which requires this court to search the record

to make sure there is no intrusion on first amendment rights and to disturb the trial court's factual findings only when they are clearly erroneous, as well as the defendants' concession that they do not ask this court to overturn the trial court's factual findings, respectfully, I cannot agree with the majority's apparent sub silentio disregard of the trial court's crucial factual findings. If it is unable to disregard the trial court's critical factual finding, the majority essentially concedes, through its citation to *State* v. *Carpenter*, 171 P.3d 41 (Alaska 2007), that such conduct is not protected speech. See id., 59 ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an [intentional infliction of emotional distress] claim if . . . it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate"). Therefore, I would affirm the judgment of the Appellate Court which concluded that, notwithstanding an independent review of the whole record, the trial court's factual findings must stand, as they are amply supported by the record and, therefore, unable to support the legal conclusion that the defendants' harassing conduct is speech of public concern. See *Gleason* v. *Smolinski*, 149 Conn. App. 283, 293–94, 88 A.3d 589 (2014); id., 306 ("[u]ltimately, the [trial] court credit[ed] the testimony of the plaintiff . . . because although the defendants testified that they did not engage in the conduct of hanging missing person posters in order to harass the plaintiff, other evidence presented . . . [showed] that the defendants had a strong motive to act in the way . . . alleged by the plaintiff" [internal quotation marks omitted]).

The defendants did not intend to convey a protected message through their intentional efforts to "hound" the plaintiff until she "broke." No ideas were expressed through the other harassing conduct that formed the basis for the trial court's judgment. The only message a reasonable person could have gleaned from the defendants' conduct, including their targeted placement of posters, is one of harassment. Such tactics included calling the plaintiff and threatening to kill her, calling the plaintiff's employer and the employer's clients to accuse the plaintiff of murder, following the plaintiff and her friends on the street and videotaping her, threatening the plaintiff and her friends in person, swearing at and calling the plaintiff names such as "ho" and "slut" and ignoring admonishments by the police to stop escalating matters before things got out of hand. Shielding this harassing conduct, the sum of which caused the plaintiff "to fear for her safety and that of her child," cannot be tolerated in a decent society and is neither envisioned nor dictated by our first amendment jurisprudence. For these reasons, I respectfully dissent.

I

INTENTIONAL INFLICTION OF EMOTIONAL

I begin by discussing the majority's opinion, first, by noting the cases it cites in setting forth relevant first amendment jurisprudence. I then discuss how, in my view, the majority has overturned a crucial finding of fact in order to conclude that the present case involves a violation of the first amendment. Because I respectfully disagree with the majority's disregard of this crucial finding, I then conclude that the cases cited by the majority, as well as additional case law, demonstrate that there is no basis for finding a constitutional violation in the present case under the third prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Specifically, I conclude that the defendants' targeted posters cannot be shielded from forming the basis of liability because it is not speech of public concern.

The majority accurately sets forth the standard of review and substantive law concerning speech of public concern. See *Snyder* v. *Phelps*, supra, 562 U.S. 453–54 ("Deciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record. . . . As in other [f]irst [a]mendment cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." [Citations omitted; internal quotation marks omitted.]); *State* v. *Krijger*, supra, 313 Conn. 447 ("[T]he heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue [were not protected by the first amendment], we accept all subsidiary credibility determinations and findings that are not clearly erroneous."). In undertaking an independent examination of the whole record to determine whether the defendants' targeted placement of posters constitutes speech of public concern, an inquiry concededly made more difficult by the defendants' failure to assert entitlement to the first amendment's protections at trial, the majority begins by examining the content, context, and form of the speech at issue.

As to the first of three factors to consider, the content of the speech, the majority examines the "objective nature of the speech at issue in the count of the complaint alleging intentional infliction of emotional distress, namely, the defendants' extensive campaign of missing person posters." It notes the "well established" principle that " '[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising

from the prosecutions . . . are without question events of legitimate concern to the public . . . .' *Cox Broadcasting Corp.* v. *Cohn*, 420 U.S. 469, 492, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975)." After noting that the posters seek information about Bill without specifically referencing the plaintiff, the majority concludes that the content of the communications relates to a matter of public concern—namely, "matters pertaining to missing persons." I agree that the content of the posters, without more, ostensibly relates to a matter of public concern.

The majority then discusses case law pertaining to the second and third factors: the context and form of the speech. As to context, the majority concedes that "the existence of preexisting animus between parties might indicate circumstantially that a defendant is dressing intentionally tortious conduct in the garb of the first amendment," though it explains that a motive to harm " 'does not necessarily render the messages conveyed . . . matters of purely private rather than public concern.' *Spacecon Specialty Contractors, LLC* v. *Bensinger*, 713 F.3d 1028, 1038 (10th Cir. 2013)." The cases cited by the majority conclude that, if the motive to harm or harass is the *sole* basis for speech uttered "with no intent to persuade, inform, or communicate" on a protected matter, the first amendment's protections do not apply because it is speech on a matter of purely private concern. *State* v. *Carpenter*, supra, 171 P.3d 59. In my view, this jurisprudence applies precisely to the present case. However, I acknowledge that, if an improper motive to harm is *not* the sole basis for uttering speech, and there exists a bona fide intent to communicate on a protected matter—which, if condemned, the protected speech will have been improperly chilled—the speech remains protected by the first amendment. See *Spacecon Specialty Contractors, LLC* v. *Bensinger*, supra, 1037–39 and 1039 n.4 (documentary inspired by news reports about company's dubious employment practices and alleged abuse of foreign workers "not shown in a purely private context," even though it was product of *some* motivation to harm company's reputation, because "[t]hat the film elucidated those matters of public concern while simultaneously advancing the [u]nion's private interests does not render the matter entirely private"). As acknowledged by the majority, the inquiry into context, form, and motive is fundamental to determining whether speech is of public concern. Without such an inquiry, as the majority notes, the first amendment risks becoming an all-purpose tort shield that is "used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern." See also *Greene* v. *Tinker*, 332 P.3d 21, 34–35 (Alaska 2014) (rejecting argument that all "speech involving a matter of public concern is inactionable" [internal quotation marks omitted]).

The majority then turns to the factual findings of the

trial court to determine whether the context and form of the targeted placement of posters demonstrates the defendants' bona fide attempt to communicate a message to the public or, rather, an attempt purely and solely intended to harass the plaintiff. The majority alludes to the trial court's finding that the defendants' targeted posters, were located primarily on, or adjacent to, public roadways, were placed "not as the result of a general effort by the [defendants] to find their son and brother but [rather] part of an effort to break her"— uttered without an attempt to communicate a protected matter to the public—and yet the majority concludes that the targeted placement of posters "was consistent with the overarching public concern of gaining information about Bill's disappearance . . . ." Having apparently disregarded the trial court's crucial factual findings, the majority then concludes that "a substantial portion of the defendants' conduct . . . was, in fact, protected by the first amendment."

The majority asserts that "[n]othing in the trial court's memorandum of decision indicates that it considered the first amendment in deciding this case. We, of course, do not fault the trial court for this. The first amendment claims were not properly preserved and must be reviewed on appeal pursuant to *Golding*." See footnote 21 of the majority opinion. I disagree. A review of the trial court opinion reveals that the trial court did consider free speech issues when deciding this matter. First, the trial court explained that "the court understands the comments in [*Petyan* v. *Ellis*, 200 Conn. 243, 254, 510 A.2d 1337 (1986)], to the effect that certain conduct which would otherwise be considered extreme and outrageous can be privileged. The [defendants] cannot be faulted for bringing their concerns and suspicions to the attention of the police and even the media. Nothing, for example, has been introduced into evidence that the . . . relationship [between Bill and the plaintiff] did not break down under circumstances involving a rival for [the plaintiff's] affection and the [defendants] concede that Bill . . . made a threatening [tele]phone call to the rival the day before [Bill] disappeared. The nature of that person's business—long-haul trucking—and the occupation of [the plaintiff's] now deceased son as a grave digger are not disputed and it would be an *unacceptable restriction on free speech* and even hamper police investigations if people did not have a right to bring such facts to the police's or even [the] public's attention. In fact, the [defendants] are to be admired for their persistent efforts to bring [Bill's] disappearance and their complaints to the highest levels of state government and the federal authorities. One cannot help sympathizing with their pain and frustration." (Emphasis added.) Furthermore, the trial court also reasoned as follows: "The foregoing also leads the court to conclude that the third and fourth element[s] of the tort have been met. [The plaintiff and other wit-

nesses] testified to the emotional distress caused [to the plaintiff] by the activities of the defendants. The enumerated facts and findings made by the court on those facts lead to the conclusion that the actions of the defendants caused [the plaintiff] emotional distress—in fact they were meant to do so. Also, it is not surprising that, given the facts, the emotional distress caused [to the plaintiff] was severe. She, in effect, felt she was being constantly hounded—*not as the result of a general effort by the* [*defendants*] *to find their son and brother but part of an effort to break her.*" (Emphasis added.)

The majority explains that it does "not suggest that the trial court was completely unaware that the general subject matter of this case has first amendment implications. The dissent's discussion of the trial court's references to the defendants' free speech rights focuses, however, on conduct whose propriety and protected nature is not at issue in this appeal, namely, the defendants' rights to speak to law enforcement authorities or the public about details surrounding Bill's disappearance. There is nothing in the trial court's opinion indicating that it considered the first amendment implications of the defendants' flyer campaign, which were a substantial basis for the plaintiff's intentional infliction of emotional distress claim." See footnote 21 of the majority opinion. I disagree. First, it is not reasonable to assume that the trial court could be aware "that the general subject matter of this case has first amendment implications" and consider it in regard to some of the defendants' conduct, but not the conduct involving the posters. Second, the trial court's statement that "it would be an *unacceptable restriction on free speech* and even hamper police investigations if people did not have a right to bring such facts to the police's *or even* [*the*] *public's attention*" belies the majority's reading of the trial court's memorandum of decision. (Emphasis added.) A reasonable reading of the trial court's reference to the public's attention would include the defendants' placement of posters. Furthermore, contrary to the majority's claim that I am addressing an issue not briefed by the parties—namely, whether the Appellate Court properly applied *Golding* review to these claims—my focus on this language in the trial court's memorandum of decision regarding free speech is in response to the majority's explicit statement that "[n]othing in the trial court's memorandum of decision indicates that it considered the first amendment in deciding this case." See footnote 21 of the majority opinion.

I respectfully disagree with the majority's apparent disregard of the factual findings and credibility determinations of the trial court. First and foremost, at oral argument, the defendants conceded that they were not asking this court to overturn the trial court's factual findings as clearly erroneous.[4] Having conceded as

such, and despite *Golding* review and an "independent examination" of the whole record, I respectfully disagree that the defendants—or the majority—are able to show that the first amendment's protections apply in light of these crucial findings. But notwithstanding the defendants' concession, the majority fails to acknowledge, and implicitly overturns, the trial court's finding that the defendants' targeted placement of posters served no purpose beyond harassing the plaintiff and expressed no protected message. Respectfully, disregarding this crucial finding does not square with the standard of review the majority purports to apply, which would require it to overturn as clearly erroneous the trial court's credibility determination that the defendants' contrived justification for their harassing conduct was, in fact, unbelievable. The majority is unable to find clear error and, absent clear error as to this crucial finding, therefore, the majority's conclusion that the defendants' harassing conduct is of public concern cannot stand in light of our first amendment jurisprudence.

Assuming that the majority chooses to overturn—without saying so and notwithstanding the defendants' concession—as clearly erroneous the trial court's factual finding that the defendants' sole purpose in placing posters near the plaintiff's home and work was to harass her, a review of the record is warranted. As noted by the majority, the standard of review requires deference to the factual findings of the trial court, especially credibility determinations regarding disputed issues of fact, unless clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 446. Only after review of the trial court's subsidiary credibility determinations and findings of fact for clear error may this court review, de novo, "whether the defendants' conduct, as found by the trial court, was subject to first amendment protection." Id. Even *Golding* review, as the majority notes, "does not permit us to disregard the trial court's findings of historical fact resolving conflicting evidence in favor of our own view of the factual record, or to make our own findings when the record reveals conflicting or inconclusive evidence on a factual point." See footnote 15 of the majority opinion. In my view, however, the majority has done just that.

The majority acknowledges, in a footnote, the following subordinate factual findings undergirding the trial court's critical finding that the defendants' sole purpose in placing posters near the plaintiff's home and work was to intimidate and harass the plaintiff until she broke: that posters placed in other towns were generally well spaced out and yet posters were placed outside

of the plaintiff's place of employment and saturated "every nook and cranny" of her bus route; that there were a large quantity of posters on one pole outside the plaintiff's house, that were replaced when taken down, and yet posters were placed nowhere else on the street; that the placement of posters continued for months and followed the plaintiff as she changed residences to avoid them; and that there was no evidence that the placement of posters along the plaintiff's bus route was necessary to aid in locating Bill. See footnote 20 of the majority opinion. The majority also acknowledges other factual findings—though elsewhere in its opinion and, in my view, absent from its analysis regarding the posters—as to additional "confrontational and harassing" conduct by the defendants that formed the basis of the effort to "break" the plaintiff and that very well may justify a judgment for intentional infliction of emotional distress upon remand: a confrontation at a police station in the town of Woodbridge during which the defendants threatend to kill the plaintiff; incidents during which the defendants called the plaintiff offensive names, followed her, videotaped her activities, and told various people that the plaintiff was a "murderer" or otherwise involved in Bill's disappearance. The majority even credits the defendants' representation that it was the actions of the plaintiff in tearing down the posters—in allegedly thwarting the defendants' legitimate efforts—that caused the defendants to target her, again, contrary to the trial court's finding that "it cannot be deduced from the evidence and testimony that the concentration of poster activity where [the plaintiff] lived and worked only commenced in reaction to [the plaintiff's] tearing down posters in that area. . . . [T]he poster hanging activity in towns where [the plaintiff] worked and lived was apparently done from the beginning of the poster hanging activity."[5] These subsidiary factual findings in the record provide ample support for the trial court's critical finding that the "sole purpose" of the defendants' placement of posters near the plaintiff's home and work was done for the purpose of "intimidating and harassing the plaintiff." In my view, the majority cannot "acknowledge" these subsidiary factual findings without upholding the crucial finding it has overturned.

Under our standard for clear error and in light of the ample support in the record, therefore, the majority could only have overturned the trial court's critical finding if it had been left with the definite and firm conviction that a mistake had been committed, a conclusion the majority has not made. And if the majority made such a conclusion, it could only have done so by its further disregard of additional relevant facts found by the trial court: that Janice Smolinski *admitted* to "intentionally saturating all the areas where she knows [the plaintiff] frequents 'because she was trying to break her' " so that the plaintiff would admit her involvement

in Bill's disappearance; that both defendants admitted to the police, the Waterbury Observer, and other parties their plans to harass the plaintiff and her friend until one of them broke down and gave them information; that Janice Smolinski admitted to the Waterbury Observer that these actions could land her in jail; and that the poster campaign was part of—and not even the exclusive means of—a larger effort to intimidate the plaintiff, intended to, and in fact becoming, the cause of the plaintiff's severe emotional distress. In light of the defendants' admission that the posters were deliberately placed to affect *only the plaintiff*—a person who undeniably already understood that the defendants sought information about Bill's whereabouts—I would uphold the trial court's finding that this conduct did not convey a message to the public or advance legitimate speech.

Most importantly, the trial court, having had the opportunity to view the demeanor of the parties and determine their credibility, clearly resolved the conflict in the parties' testimony to make its crucial factual finding. The trial court characterized the parties' conduct as a " 'cat and mouse game' " for which "both sides can be faulted for the antagonistic activity that developed." Additional review of the trial transcript reveals just how deep the acrimony between the parties ran—at one point during the plaintiff's testimony, Janice Smolinski interrupted the plaintiff stating: "Stop it. . . . Stop it. It's not all about you, it's not. Stop." The court took a recess after this outburst, after which the plaintiff's attorney noted that, during the recess, a family member of the defendants "directed an obscenity" at the plaintiff. The trial court then attempted to calm the parties, though it acknowledged that "emotions are boiling . . . ." A fair review of the record cannot, without overturning the trial court's determination as to the defendants' credibility, lead to the definite and firm conviction that a mistake has been committed—instead, the record indicates the turn of a blind eye toward the facts that the majority should have considered. Contrary to its statement that *Golding* review does not permit it to do so, the majority has made several of its own factual "findings when the record reveals conflicting or inconclusive evidence on a factual point." See footnote 15 of the majority opinion.

To the extent the majority might have come to its conclusion by "[performing] a fresh examination of crucial facts under the rule of independent review"; (internal quotation marks omitted) *DiMartino* v. *Richens*, 263 Conn. 639, 662, 822 A.2d 205 (2003); it has not stated how it performed this examination without disregarding credibility determinations made by the trial court, which our first amendment jurisprudence does not allow us, and the defendants have not asked us, to do. See *State* v. *Krijger*, supra, 313 Conn. 447. The majority suggests that a proper application of the rule of indepen-

dent review would involve a species of "the clearly erroneous standard of review [while] tailoring [the review] to the specific trial court determinations at issue . . . ." But as the Appellate Court noted, it is unclear how that standard permits us to overcome the trial court's finding that the defendants' sole intent was to harass without discounting the trial court's consideration of the parties' credibility as to this crucial issue of fact. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 306 ("[u]ltimately, the court credit[ed] the testimony of the plaintiff . . . because although the defendants testified that they did not engage in the conduct of hanging missing person posters in order to harass the plaintiff, other evidence presented . . . [showed] that the defendants had a strong motive to act in the way . . . alleged by the plaintiff" [internal quotation marks omitted]). This crucial finding must stand.

If, therefore, the majority could not have overturned as clearly erroneous the factual finding that the defendants' *sole* intent in targeting posters at the plaintiff was to harass her until she broke, given its citation to relevant case law, the majority essentially concedes that its conclusion cannot stand. See *State* v. *Carpenter*, supra, 171 P.3d 59 ("[e]ven speech that relates to a matter of public interest loses its protection and can give rise to an [intentional infliction of emotional distress] claim if . . . it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate"). No other cases cited by the majority support the conclusion that the defendants' conduct in the present case is speech of public concern. Indeed, no case has afforded the first amendment's protections to speech of facially acceptable content expressed in a traditional public forum, where the speech: (1) is uttered in a context that consists of the *sole and exclusive* desire to harm the plaintiff and, concomitantly, no intent to convey a protected idea or message to the public; (2) is inextricably linked to intimidating conduct that borders on harassment of a private party on a purely private matter; and (3) if condemned, does not chill protected speech or pose a risk of self-censorship. To conclude as it has, the majority has, in effect, applied the first amendment as an all-purpose tort shield "used as a cloak or veil for intentionally tortious conduct that is only tangentially related to the claimed matter of public concern." See *Greene* v. *Tinker*, supra, 332 P.3d 34–35. In my view, the majority's citation to *Spacecon Specialty Contractors, LLC* v. *Bensinger*, supra, 713 F.3d 1039, and *State* v. *Carpenter*, supra, 171 P.3d 59, as discussed previously in this opinion, are sufficient to establish that the defendants' speech is not of public concern.

My review of additional first amendment case law also supports my conclusion. *Keene* v. *Cleaveland*, N.H. , 118 A.3d 253 (2015), is instructive, containing facts most similar to those in the present case and

differing only by factual findings regarding the legitimacy of the actors' intent to express protected speech to the public and the extent to which protected speech would be chilled if the conduct were condemned. In *Keene*, the Supreme Court of New Hampshire confronted a claim that the first amendment protects conduct intended to harass parking enforcement officers issuing parking tickets. Id., 255. The facts of *Keene* are set forth in the majority opinion and, therefore, need not be repeated here. See footnote 22 of the majority opinion. I emphasize, however, that in conceding that the content and locational context favored protection, the plaintiff in that case, the city of Keene, argued that certain other facts indicated that the conduct at issue constituted " 'significantly harassing behavior under the guise of political expression,' and, therefore, [rendered the conduct] not constitutionally protected." *Keene* v. *Cleaveland*, supra, 258. Specifically, the plaintiff in that case argued that aspects of the defendants' conduct, namely "following closely, chasing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity" had a tortious impact on the parking enforcement officers. (Internal quotation marks omitted.) Id., 260. The New Hampshire Supreme Court disagreed that this impact rendered the speech a matter of private concern, highlighting the fact that the defendants "*intended* [this conduct] to draw attention to the [c]ity's parking enforcement operations and to persuade the [parking enforcement officers] to leave their positions." (Emphasis added.) Id., 261. Because the challenged conduct was the vehicle for the defendants' bona fide political protest, imposing liability for the conduct would infringe upon the defendants' right to free speech, undermine the free and robust debate of public issues, and pose the risk of a reaction of self-censorship on matters of public import. Id.; see also *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 910, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (first amendment protects rights of individuals to engage in public protest, even if protest activity causes economic harm, for purpose of influencing societal or governmental change, because speech "does not lose its protected character . . . simply because it may embarrass others or coerce them into action").

The defendants' use of posters touches on the same first amendment concerns as the defendants' conduct in *Keene*. Specifically, the content of the speech related to a matter of public concern, the activities generally occurred in traditional public fora, and the context of the speech involved types of harassment. But the critical difference between the two cases, as mentioned previously, is the factual finding regarding the actors' intent to express a message or idea traditionally protected by the first amendment to the public.

In *Keene*, the defendants engaged in harassing activ-

ity that, as a matter of fact, was inextricably linked to, and intended to advance, their protected message to the public—a message protesting the government. Such speech is worthy of the strongest first amendment protections. See *State* v. *Krijger*, supra, 313 Conn. 450 (reiterating the " 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials' "), quoting *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); see also *State* v. *Peter*, 798 N.W.2d 552, 553 (Minn. App. 2011) (reversing conviction for disorderly conduct for protesters outside fur store because "their statements and conduct did not rise to the level of 'fighting words,' and their loud chanting and yelling were 'inextricably intertwined' with their political protest, which was protected by the [f]irst [a]mendment").

By stark contrast, in the present case, the trial court found that the defendants' targeting of the plaintiff, in the context of their other intimidating activities, was not a bona fide expression to the public of a message that the first amendment protects. Specifically, the trial court found that "the poster campaign in areas where [the plaintiff] lived and worked [was] part of a larger effort to intimidate her. . . . [The plaintiff] was being constantly hounded—not as the result of a general effort by the [defendants] to find their son and brother but part of an effort to break [the plaintiff]. . . . [The defendants] pursued their action with these purposes in mind." See *Connick* v. *Myers*, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) ("[A] questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. [W]hether [the utterances] . . . could be matters of public concern is beside the point—it does not answer whether *this* [utterance] is such speech." [Emphasis in original.]). The defendants' conduct might have tangentially involved protected speech, but the other actions of the defendants, made transparent by their own admissions as to their purpose to harass, formed the basis of the trial court's credibility determination that this conduct was merely and solely tortious conduct directed at a private party in an antagonistic, private dispute. See *People* v. *Little*, Docket No. 4-13-1114, 2014 WL 7277785, *7 (Ill. App. December 22, 2014) (conviction for stalking affirmed, statute not unconstitutionally overbroad and properly applied to defendant's conduct because "preexisting relationship and conflict [between the defendant and his wife] strongly suggest [the] defendant is attempting to mask an attack on [his wife] over a private matter as a protest of a matter of public concern" and because "nothing in the evidence suggests that in driv-

ing by [the women's shelter], [the] defendant intended to peacefully protest a matter of public concern in a public forum . . . [or] 'convey his position on abortion utilizing a method designed to reach as broad a public audience as possible' "). As the trial court found, nothing in the evidence suggests that, in hounding the plaintiff and placing posters near every place she frequented, the defendants intended to advance a message—a message that was found to have been protected in the defendants' other actions in other contexts—to the public. Rather, this conduct was "*not* as the result of a general effort by the [defendants] to find their son and brother, but [rather], part of an effort to break [the plaintiff]."[6] (Emphasis added.)

The comparison between the protected speech in *Keene* and the unprotected speech in the present case is reinforced when one examines whether a judgment for money damages would run the risk of chilling protected speech. In *Keene*, a judgment against the defendants would mean that the defendants, believing as they did that the government's actions in issuing parking tickets should not be tolerated and hoping to broadcast this belief to the public, would be penalized for expressing this message. It would also mean that future protesters of governmental action in New Hampshire would think twice and potentially self-censor before launching an unpleasantly sharp attack on their government or its officials. By contrast, the judgment against the defendants in the present case does not pose these risks: the judgment does not penalize the defendants for searching for Bill or bringing their grievances about the authorities' lack of diligence to public light, undeniably protected conduct. The trial court concluded that these bona fide efforts—the efforts in publicizing the case on television and in the Waterbury Observer, the efforts to hang posters in multiple states in a manner actually intended to yield tips as to Bill's whereabouts and to advance their cause—merited admiration and encouragement. The trial court stated that "it would be an unacceptable restriction on free speech and even hamper police investigations if people did not have a right to bring such facts to the police's or even [the] public's attention." The trial court further concluded that "the defendants [cannot] be held accountable [for] . . . [t]he publicity about the case . . . [and] had a right to voice what they felt were valid criticisms of the way law enforcement authorities handled the investigation and their pleas for help in order to try to ensure that the intensity of the investigation would be increased and relevant areas of inquiry would be pursued. This is a commonly exercised right of citizens in dealing with what they consider to be unresponsive authorities and a crucial aspect of preserving a functioning democracy."

As the trial court found and the Appellate Court affirmed, however, expressing criticism of the police

or engaging in the public search for Bill was not the defendants' intent when they targeted the plaintiff with posters. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 306. Affirming the judgment against the defendants would penalize them only for going "beyond the acceptable parameters" of a decent society and engaging in opprobrious behavior wholly divorced from any protected message. Instead of chilling speech or posing any risk of self-censorship, the judgment prevents the actions of these defendants—and thereby future individuals—from targeting, intimidating, harassing, and *intentionally* inflicting emotional distress upon any person they believe to have previously engaged in the commission of a crime. Affirming the judgment would not require the defendants to take down all of their posters or cease their search for Bill; it is consistent with the protections afforded by the first amendment while vindicating our state's "legitimate interest in redressing wrongful injury"; *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); by reaching "no farther than is necessary to protect the legitimate interest involved." Id., 349.

Affirming the judgment of the trial court is also consistent with *Snyder*, from which the majority quotes extensively and upon which the majority appears to rely. In my view, reliance on *Snyder* is not apt. As in the present case, the content of the speech in *Snyder* related to a matter of public concern—a viewpoint critical of the government. But contrary to the present case, the context of the speech revealed that the defendants actually intended to convey this viewpoint to the public by way of its picketing. In *Snyder*, the United States Supreme Court concluded that the defendants "had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of [Marine Lance Corporal] Matthew Snyder, and there can be no serious claim that [the defendants'] picketing did not represent its 'honestly believed' views on public issues." *Snyder* v. *Phelps*, supra, 562 U.S. 455. "There was no [preexisting] relationship or conflict between [the defendants] and [the plaintiff] that might suggest [the defendants'] speech on public matters was intended to mask an attack on [him] over a private matter." Id. Moreover, the plaintiff's distress in *Snyder* was not caused by harassing conduct; instead, "any distress occasioned by [the defendants'] picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself." Id., 457. In other words, it was the content of the speech—the honestly believed, protected message that the defendants in *Snyder* wished to communicate to the public—that caused the distress, not the context in which the speech occurred.[7]

By contrast, the distress experienced by the plaintiff in the present case resulted solely from the context in which the speech occurred—the relentless hounding

of the plaintiff where she lived and worked—not the content of the posters. See *Watts* v. *Chittenden*, 305 Conn. 575, 605, 22 A.3d 1214 (2011) ("it is the repetition of the misconduct that makes it extreme and outrageous"); see also A. Caplan, Free Speech and Civil Harassment Orders," 64 Hastings L.J. 781, 838 (2013) ("[T]hroughout much civil harassment litigation . . . the petitioner's emotional state is often a reaction to the content of [the] respondent's speech. The constitutional evil of content discrimination can often be avoided in practice by recasting allegations about content as allegations about unwanted contact. Ending unconsented contact [regardless of the content that may be conveyed during the contact] is a permissible exercise of the government's power to regulate, on a content neutral basis, the noncommunicative aspects of expressive activity."). The acrimonious, preexisting relationship between the parties from the very start, the abundance of other harassing conduct, and especially the defendants' admissions that their actions were meant to hound the plaintiff until she broke, indicate no honestly believed, protected message intended to be conveyed to the public, but rather a relentless, private attack on the plaintiff to vindicate a perceived wrong.

In addressing the possibility that speech could be chilled by affirming the judgment for intentional infliction for emotional distress in *Snyder*, the United States Supreme Court recognized that, by condemning the defendants' speech, the jury could have imposed liability on the basis of their "tastes or views, or perhaps . . . their dislike of a particular expression . . . [which would pose] a real danger of becoming an instrument for the suppression of . . . vehement, caustic, and sometimes [unpleasant] expression." (Citation omitted; internal quotation marks omitted.) *Snyder* v. *Phelps*, supra, 562 U.S. 458. By contrast, condemnation of the defendants' harassing conduct in the present case does not pose any risk of having resulted from differing tastes or views on what the posters conveyed or the ideas they espoused, nor does it pose a risk of suppressing unpleasant expression. It merely imposes liability for the "continued, aggravated nature of the defendants' activity in hounding [the plaintiff] where she lived and worked" for the sole purpose of intimidating and harassing the plaintiff and "not as the result of a general effort by the [defendants] to find [Bill]."

In light of the foregoing, I would uphold the critical factual findings of the trial court which, in the absence of any case law to the contrary[8] and as essentially conceded by the majority by its citation to *State* v. *Carpenter*, supra, 171 P.3d 58–59, cannot reasonably render the defendants' conduct to be speech of public concern. See id., 56–57 ("We distinguish between speech, however crude . . . directed at persuading the ultimate target to change her mind about a matter of public concern, and speech intended merely to harass or cause others

to harass the target. Speech of the latter sort is not entitled to [f]irst [a]mendment protection."). To the extent the majority would conclude that the defendants could properly harass the plaintiff to persuade her to divulge information about her involvement in Bill's disappearance, the content of this "communication" ceases to be of public concern because it no longer advances any interest in informing the public about the commission of crime; see *Cox Broadcasting Corp.* v. *Cohn*, supra, 420 U.S. 492; but rather amounts to drawing out a confession from a private citizen by way of tortious conduct. I would affirm the judgment of the Appellate Court, which concluded that the defendants have not satisfied the third prong of *Golding* review because they have not established any constitutional violation. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 293–95.

But even assuming, arguendo, that the defendants' targeted posters represented speech of public concern and that the defendants established a constitutional violation under the third prong of *Golding*, I respectfully disagree with the majority's conclusion that the fourth prong of *Golding* requires a remand because of the "apparent significance of the flyer campaign to the trial court's finding on her intentional infliction of emotional distress claim." In my view, the constitutional violation, if any, is harmless beyond a reasonable doubt. The majority has conceded the existence of extensive and continuous "confrontational and harassing behavior, including calling the plaintiff offensive names, following her, and videotaping her activities" that, as detailed previously in this dissenting opinion, is a sound, independent basis for the judgment. Including the other relevant facts that, in my view, the majority should have considered—such as the fact that the plaintiff received threatening telephone calls from Bell, causing the plaintiff to fear for her safety and that of her child—any constitutional violation is harmless beyond a reasonable doubt.[9]

Like the Appellate Court, I would conclude that the defendants did not satisfy the third prong of *Golding* because they have not established a violation of their first amendment rights. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 293–95.

II

DEFAMATION

I next turn to the majority's discussion of the plaintiff's claim of defamation. I agree with the majority's analysis and conclusion that the three statements at issue—private accusations to private individuals that the plaintiff was a "murderer"—were defamatory statements of fact, not of opinion. I respectfully disagree, however, with the remainder of the majority's analysis, in particular, its conclusion that the statements at issue

constitute speech of public concern meriting the protections of the first amendment. In my view, a proper inquiry into the content, context, and form of these private accusations leads to the conclusion that the first amendment's protections are unwarranted. Without analysis, the majority concludes that "the parties do not dispute for purposes of the defamation claim that the oral statements at issue, which pertain to the plaintiff's role in Bill's death or disappearance, implicate a matter of public concern for first amendment purposes." I respectfully disagree.

Contrary to the precedent to which it cites,[10] the majority fails to conduct *any* analysis of the content, context, and form of the defamatory utterances at issue, affording them the first amendment's protections without inquiry. See *Snyder* v. *Phelps*, supra, 562 U.S. 453 ("[d]eciding whether speech is of public or private concern *requires us to examine the content, form, and context of that speech*" [emphasis added; internal quotation marks omitted]). Failure to make this inquiry is inconsistent with a de novo standard of review, notwithstanding that the present case comes to us on *Golding* review or with less than clear briefing. See *State* v. *Krijger*, supra, 313 Conn. 446 ("[A]n appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . This rule of independent review was forged in recognition that a[n] [appellate] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." [Citation omitted; internal quotation marks omitted.]).

Instead of performing its own independent review of the whole record, the majority merely cites to three cases to support its position that the statements are of public concern because they "pertain to the plaintiff's role in Bill's death or disappearance . . . ." None of the three cases created a per se rule that *any* accusation of crime garners the first amendment's protections. Instead of creating per se rules, the court in each of those cases engaged in its own requisite inquiry into content, context, and form of the defamatory statements to come to a legal conclusion that the statements merited the first amendment's protections. As for their ultimate legal conclusions, all of the cases predicated the first amendment's protections on bases not applicable to the present case; see footnote 8 of this dissenting opinion; *Holloway* v. *American Media, Inc.*, 947 F. Supp. 2d 1252, 1261 n.8 (N.D. Ala. 2013) (article published involved public figure); *Miles* v. *Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998) (article published was matter of public concern because murder was national

"media spectacle"); *Shoen* v. *Shoen*, 292 P.3d 1224, 1229–30 (Colo. App. 2012) (statements were made on television program "during a two-hour interview, in which—among other things—[the speaker] criticized the quality and completeness of the [s]heriff's investigation" and therefore "related to a matter of public concern because they addressed [the speaker's] views about the adequacy of the investigation by public law enforcement officers when unanswered questions remained"). Though the content of the speech in those cases might have touched on a matter of public concern, the context of the speech involved attempts to convey a message *to the public*, vastly differing from the intended audience—private individuals—in the present case.

I would conclude, instead, that *Sartain* v. *White*, 588 So. 2d 204 (Miss. 1991), is instructive. In *Sartain*, neighbors were embroiled in a terrible conflict over a period of years. Id., 205. The defendants alleged that the plaintiff, a woman with arguable mental capacity, accused them, verbally in public and in letters to third parties, of various criminal acts including murder. Id., 206. After the defendants prevailed on their claim for defamation, the plaintiff appealed, citing to *Gertz* and claiming the protections of the first amendment in accusing the defendants of various crimes. Id., 213. The Supreme Court of Mississippi concluded that only if the plaintiff's accusations amounted to speech of public concern would the first amendment have been applicable. Id. After detailing the plaintiff's borderline delusional behavior, the court discussed the content, context, and form of the accusations, concluding as follows: "The content of the debate in question involves whether the [defendants] are murderers, robbers and terrorists. The form of the debate involved various pleadings, letters to city officials, and oral tirades within a neighborhood. The context of the debate involves a dispute between a respectable family as the accused and an accuser with a rather notorious past. Though accusations of this nature generally are a matter of public concern, in this context and emanating from this source, we find that they are not in this case."[11] Id.

Assuming, arguendo, that the defendants' accusations in the present case touched on a matter of public concern, which is far from a settled proposition; see footnote 8 of this dissenting opinion; the facts surrounding this case, like those in *Sartain*, reveal that the defendants' utterances were merely part and parcel of harassing conduct. As the record amply demonstrates, the parties have been embroiled in an emotionally-charged and very private dispute in which, as the trial court put it, "[t]wo sets of basically decent people found themselves in conflict and involved in a series of mutually antagonistic events because of a tragic event . . . ." These accusations occurred during confrontations with the plaintiff's friends, and to a stranger during the course of following the plaintiff—conduct

the majority concedes is not subject to the first amendment's protections. Indeed, unlike in the three cases cited by the majority, the fact that the utterances in the present case were *not* directed to the public at large belies the claim that this speech is of public concern. See *Obsidian Finance Group, LLC* v. *Cox*, 740 F.3d 1284, 1292 (9th Cir.) (public nature of allegation against appointed bankruptcy trustee militated in favor of conclusion that allegation was of public concern), cert. denied, U.S. 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014); *Flamm* v. *American Assn. of University Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("[that the challenged utterance] was also distributed to a public audience with an interest in issues of gender discrimination . . . [and] mailed, at a minimum, to hundreds of [the plaintiff's] peers and fellow professionals nationwide . . . [makes it more likely that the utterance was] clearly intended to, and can reasonably be viewed as an attempt to, influence public discourse and affect the public response to incidents of gender discrimination"); *Johnson* v. *Ryan*, 186 Wash. App. 562, 575, 346 P.3d 789 (2015) ("there should be some degree of closeness between the challenged statements and the asserted public interest" [internal quotation marks omitted]).

I would conclude that the defendants' private accusations of murder were "solely in the individual interest of the speaker . . . [and therefore warrant] no special protection . . . ." (Citation omitted.) *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749, 762, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (plurality opinion). It is worth stressing that these private accusations forming the basis of the judgment lie in stark contrast to the defendants' *other*, protected speech *not* forming the basis of the judgment: namely, the defendants' speech that brings to the public's attention in the Waterbury Observer and on television the authorities' lack of diligence in pursuing the case in light of allegations that the plaintiff was involved in a love triangle. But far from the context of the defendants' legitimate attempts to exercise their free speech rights, and, instead, just as in *Sartain*, the context of the statements forming the basis of the judgment evinces a purely private conflict that simply cannot be attributed to any exposition on a public matter. See also *Connick* v. *Myers*, supra, 461 U.S. 148 n.8 ("[A] questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. [W]hether [the utterances] . . . could be matters of public concern is beside the point—it does not answer whether *this* [utterance] is such speech." [Emphasis in original.]).

The majority's extension of the first amendment's protections to the defendants' defamatory statements has serious consequences, namely, a shift in the burden of proof as to the truth or falsity of the alleged defama-

tory statement from the defendants to the plaintiff. The burden of proof is often dispositive of actions for defamation, especially in cases involving defamatory statements difficult to prove or disprove, often the same cases in which the parties present scant evidence. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 776–78, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986) ("the burden of proof is the deciding factor only when the evidence is ambiguous" and although "requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so . . . [this rule is justified in order] to protect speech that matters" [internal quotation marks omitted]). Without a reasoned legal conclusion that the defendants' speech is of public concern, affording the defendants protection under the first amendment serves only to shield false criminal accusations made by one private party against another private party. Such a result is inconsistent with first amendment jurisprudence. Cf. *Wolston* v. *Reader's Digest Assn., Inc.*, 443 U.S. 157, 168–69, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979) (rejecting contention that "any person who engages in criminal conduct automatically becomes a public figure" because "[t]o hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime"); see *Gertz* v. *Robert Welch, Inc.*, supra, 418 U.S. 341 ("[w]e would not lightly require the [s]tate to abandon [the underlying state interest in compensating individuals for harm inflicted on them by defamatory falsehoods]"). This result is also inconsistent with our classification of such statements as defamatory per se, which operates to *lighten* the burden on a plaintiff by presuming injury to a plaintiff's reputation. See *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 551, 733 A.2d 197 (1999).

An inquiry into the content, context, and form of the defamatory statements at issue, the harassing context of which is discussed at length previously in this dissenting opinion, leads me to conclude that the defamatory statements at issue in the present case are not speech of public concern and, therefore, are not entitled to protection under the first amendment. The defendants intended to convey no protected message on any matter of concern to the public and, therefore, affirming the judgment in the present case chills no protected speech. The constitutional guarantees of the first amendment " 'can tolerate sanctions against calculated falsehood without significant impairment of their essential function.' [*Time, Inc.* v. *Hill*, 385 U.S. 374, 389–90, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967)]. Indeed, [f]irst [a]mendment protections must function in balance with competing interests protected by state tort law, among which the sanctity of reputation . . . [is] seminal to our jurisprudence." *Krajewski* v. *Gusoff*, 53 A.3d 793, 808 (Pa. Super. 2012), appeal granted, 621 Pa. 117, 74 A.3d 119, appeal dismissed, 624 Pa. 224, 84 A.3d 1057 (2014).

Because I would conclude that the plaintiff's defamation claim does not implicate the first amendment—because it involves a private plaintiff, private defendants, and a matter of purely private concern—I would apply the common law of defamation in the present case and, accordingly, I would not have shifted the burden of proving falsity to the plaintiff. Without this shift, I would conclude that the plaintiff met her burden of proving a common-law defamation claim by a preponderance of the evidence. I would then conclude that the defendants neither pleaded nor proved the common-law affirmative defense of truth by a preponderance of the evidence. See *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 228–29, 837 A.2d 759 (2004) ("under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact for the jury" [citation omitted]). Finally, I would conclude that the plaintiff established entitlement to punitive damages in the present case.

I begin with the trial court's decision, which correctly set forth the common law of defamation, and review the record to determine whether the plaintiff proved a prima facie case. The majority appears to concede, and I agree, that the plaintiff proved a common-law prima facie case for defamation, not disputing that the defendants' statements are properly classified as defamatory per se because they charge crimes punishable by imprisonment. But the inquiry into whether the defendants proved the truth of the defamatory statements as an affirmative defense is rendered more difficult because the defendants neither pleaded nor proved this defense. Indeed, at trial, the defendants decided to deny calling the plaintiff a murderer, instead of *justifying* having made those utterances by pleading and proving their truth. The defendants' failure to proffer evidence that the plaintiff murdered Bill is therefore unsurprising, as that issue was raised for the first time on appeal. Even if the defendants had properly pleaded, and subsequently attempted to prove, the truth of their defamatory utterances, the defendants would have needed to show that the plaintiff was a murderer by a preponderance of the evidence, meaning that "the evidence, considered fairly and impartially, induce[s] in the mind of the trier a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true." (Internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, supra, 249 Conn. 535 n.8. On appeal of "a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them." *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 628–29, 969 A.2d 736 (2009).

A review of the memorandum of decision demonstrates that the defendants failed to prove that the plaintiff murdered Bill by a preponderance of the evidence and that the trial court implicitly found as such. By repeatedly referring to the statements as "defamatory," the trial court was implicitly finding that the defendants had not proven the statements to be true. Our case law, however imprecisely, has at times used the term "defamatory" as a synonym for "false" in defamation actions, as it represents the legal conclusion that a prima facie case has been presented. See, e.g., *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 639; *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 534, 543, 646 A.2d 92 (1994), cert. denied, 513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995); *Cweklinsky* v. *Mobil Chemical Co.*, supra, 267 Conn. 228. Even our model jury instructions define a "defamatory statement" as "a false communication . . . ." Connecticut Civil Jury Instructions (4th Ed. 2008) § 3.11-1, available at http://www.jud.ct.gov/JI/civil/part3/3.11-1.htm (last visited October 19, 2015). The trial court reinforced this implicit finding in its discussion of actual malice, in which it stated that the defendants presented absolutely no evidence that the plaintiff murdered Bill: "We do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture."

Because I read the trial court's thorough memorandum of decision as setting forth a finding that the defendants did *not* prove truth of their assertion that the plaintiff was a murderer, I now review the record to determine whether that factual finding is clearly erroneous. The defendants never alleged, either in their pleadings or at trial, that the plaintiff murdered Bill. They neither attempted to, nor succeeded in, presenting *any* evidence that could have led the trial court to conclude that it was more probable than not that the plaintiff murdered Bill. My own review confirms that the record is, in fact, devoid of any such evidence; there is no body, no weapon, and no evidence of foul play. The plaintiff, her friends, and all of the other witnesses at trial made no statements accusing the plaintiff of Bill's murder. Even after having hired a private detective, the defendants offered nothing other than conjecture to support their claim. That the plaintiff declines to speak to the police on advice of counsel does not inject clear error into the trial court's findings, nor does it establish that it is more probable than not that the plaintiff murdered Bill. At most, this evidence might suggest that, according to the majority, "the plaintiff, at the very least, knows more than she is saying about Bill's disappearance." But that is a far cry from establishing that the plaintiff is a "murderer," which is the actual defamatory statement forming the basis of the judgment in the present case. Because there is no competent evidence in the record to contradict the trial court's implicit finding that the defendants failed to prove that the plain-

tiff murdered Bill, the trial court's finding that the defendants failed to prove the truth of the defamatory statements is not clearly erroneous. Accordingly, I would affirm the judgment of the trial court on this count.

This does not end the inquiry, however, because the plaintiff sought and was awarded punitive damages. Because, in my view, this case lacks first amendment significance, and in light of the standard of review, I would conclude that the plaintiff proved her entitlement to common-law punitive damages. The trial court and the Appellate Court appropriately concluded that, to be awarded punitive damages in a defamation case lacking first amendment significance, the common law of damages applies. See *Gleason* v. *Smolinski*, supra, 149 Conn. App. 312–14, citing *DeVito* v. *Schwartz*, 66 Conn. App. 228, 236, 784 A.2d 376 (2001); see also *Johnson* v. *Johnson*, 654 A.2d 1212, 1215–16 (R.I. 1995).

Common-law "[p]unitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." *Vandersluis* v. *Weil*, 176 Conn. 353, 358, 407 A.2d 982 (1978). "If the evidence discloses that a defendant was recklessly indifferent to the rights of a plaintiff, an actual intention to do harm to the plaintiff is not necessary." *Berry* v. *Loiseau*, 223 Conn. 786, 811, 614 A.2d 414 (1992). "[T]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). In the present case, the trial court concluded "when all is said and done, [the plaintiff] was subject to intentional infliction of emotional distress." Moreover, having chosen a trial strategy of denying having made the defamatory statements instead of *justifying* having made them, the defendants even offered no self-serving testimony to the effect that they actually believed the plaintiff murdered Bill, testimony the trial court could have easily utilized in assessing whether punitive damages were warranted. Cf. *St. Amant* v. *Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968) ("[i]t may be said that [the test for actual malice] . . . permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity"); see also *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 641–42 ("The fact that the defendants continued to assert that they believed that the plaintiff had [committed a crime] was not dispositive of the issue of whether they had known that their statements were false or recklessly disregarded their truth. A trial court must evaluate a defendant's testimony, including whether there are grounds to support it, and is not constrained simply to accept a defendant's assertion that he did not know that his statement was false.").

In light of the exhaustive evidence of the defendants' hostility and spite, I would conclude that the trial court's decision to award punitive damages was not an abuse of discretion and, therefore, affirm the judgment of the trial court in full.

Although I would conclude that the first amendment does not protect the defendants' accusations of murder, because the majority has applied the first amendment to the present case, I briefly address several concerns I have with the majority's analysis.

First, I am not convinced that the majority should even have reached the issue of whether the plaintiff proved falsity as part of a prima facie case for defamation concerning speech of public concern. The majority acknowledges that neither party asked us to reach this issue, stating that "this claim was not preserved in the trial court" and "we exercise our discretion to review it . . . despite the defendants' failure to ask that we do so . . . ." (Citation omitted.) The defendants only asked that we review whether the plaintiff proved actual malice so that we would reverse the award of punitive damages. See *Cox* v. *Galazin*, 460 F. Supp. 2d 380, 388 (D. Conn. 2006) ("If the plaintiff were a private individual and the statements concerned a purely private matter, the plaintiff would not need to show actual malice in order to establish liability. Further, in such a situation, if the statements constituted defamation per se, the plaintiff would also not need to prove actual injury and could recover presumed general damages."); *Gleason* v. *Smolinski*, supra, 149 Conn. App. 312–14 (affirming award of punitive damages).

Second, having reached the issue of falsity despite the failure of any party to request that we do so, and even assuming arguendo that the defendants' defamatory statements were speech of public concern, thereby shifting the burden to the plaintiff to prove that she did not murder Bill, the majority does not explain by what burden of persuasion the plaintiff must prove her innocence on remand. Though the majority concludes that a new trial is warranted because, in its view, the trial court failed to conduct a falsity analysis, the majority does no more than note that there is a "debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence." *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 661 n.2, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). Because the proper burden of persuasion is likely to arise on remand; see *Weaver* v. *McKnight*, 313 Conn. 393, 417–18, 97 A.3d 920 (2014); in my view, the majority should have set forth the burden of persuasion a private plaintiff must meet in proving the falsity of a defamatory statement of public concern.[12]

Lastly, I respectfully disagree with the majority's conclusion that the plaintiff failed to prove by clear and

convincing evidence that the defendants uttered their defamatory statements with actual malice. At the outset, I note that the defamatory statement for which the majority appears to test the record is the statement "to other people that the plaintiff, at the very least, knows more than she is saying about Bill's disappearance." I respectfully disagree. The majority's characterization of the defamatory statement at issue is a far cry from the *actual* defamatory statement at issue in the present case—"murderer"—forming the basis of the judgment. In my view, to properly address the issues in the present case, the majority *must* test the record to determine whether the defendants acted with actual malice in accusing the plaintiff of murdering Bill. As the trial court noted, "[e]specially in a case like this, where the pain and emotions are so apparent and understandable, it is important that things be gotten right so as not to add to the pain and suffering of what to the court at least are sympathetic parties caught in a difficult maelstrom."

Assuming that the majority's analysis nevertheless addresses whether the plaintiff proved that the defendants acted in reckless disregard for the truth of whether she murdered Bill, I turn now to the majority's analysis. The majority accurately sets forth the substantive law and standard of review for actual malice in a defamation case. The majority agrees that "[t]he proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements . . . ." *Gambardella* v. *Apple Health Care, Inc.*, supra, 291 Conn. 638. It also agrees that "we defer to the trier's findings with respect to, for example . . . whether [a party] acted in good faith in publishing a statement later deemed defamatory."

In the present case, the trial court found as follows: "The statements referenced . . . to [Melissa] DePallo and [Fran] Vrabel and the man at the gym, in the court's opinion meet the requirements of defamation as set forth in [*Cweklinsky* v. *Mobil Chemical Co.*, supra, 267 Conn. 217].

"The statements to DePallo and Vrabel say directly [that the plaintiff] was a murderer or involved in the murder of Bill . . . . The statements made to DePallo and Vrabel were obviously 'published' to them. The statement made to the man at the gym was published to him. In all these situations [the plaintiff] was identified to the listener and since [the plaintiff] was being accused of murder or involved with murder the defamations are per se accusations since murder clearly involves a crime of 'moral turpitude' or 'infamous penalty.' We do not have here mere opinion—[the plaintiff] was said to be a murderer or involved in a situation where murder occurred.

"The statements if made were made with actual malice under the law as the court interprets it. There was reckless disregard of whether the statements that were

alleged to have been made were truthful. We do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture." I agree with the trial court. In light of the ample evidence demonstrating the defendants' hostility and spite, which has been discussed at length previously in this opinion, I would conclude that the plaintiff established by clear and convincing evidence that the defendants recklessly disregarded whether their statements were truthful. Therefore, I would affirm the award of punitive damages.

For the reasons set forth previously in this opinion, I do not view the present case as one implicating the first amendment. Consequently, I would affirm the judgment of the Appellate Court in all respects. Therefore, I respectfully dissent.

[1] I note that, although John Murray was also named as defendant in the present case, the claims made against him are not at issue in the present appeal. See footnote 3 of the majority opinion. For the sake of simplicity, I refer to Janice Smolinski and Bell collectively as the defendants and individually by name.

[2] Although B and B Transportation, Inc., was also a plaintiff in the underlying action, it is not a party to the present appeal. See footnote 2 of the majority opinion. I therefore refer to Gleason as the plaintiff.

[3] For the sake of consistency with the majority opinion, I hereinafter refer to William Smolinski, Jr., as Bill. See footnote 1 of the majority opinion.

[4] The following colloquy during oral argument before this court evinces the defendants' concession:

"The Court: Didn't the trial court find that your client had said that the reason that she was putting up these posters was to 'break' the plaintiff to get her to cooperate? . . .

"[The Defendants' Counsel]: It is a finding, Your Honor, but I don't think it's supported by the record. . . .

"The Court: The trial court found that the defendants were posting the 'murdered' posters on the dead end road where the plaintiff was staying, they were found to have specifically targeted the plaintiff's home and the homes where she stayed. So you're asking us to find that all . . . of those [findings] were clearly erroneous . . .? Did you specifically ask us to do that?

"[The Defendants' Counsel]: Your Honor, I don't think that it matters that they're targeted. . . .

"The Court: I understand . . . but you seem to be saying . . . that the [trial] court was factually incorrect . . . as to where [the posters] were being tacked up and the question about whether [the defendants] was trying to 'break' her.

"[The Defendants' Counsel]: The issue of trying to 'break' her . . . is one of semantics. I think if you look at the total record, the record just doesn't support that my client[s] had any axe to grind against [the plaintiff]. My client[s] [were] trying to replace posters in an effort to find [Bill] . . . . And so . . . whether the trial court's opinion is clearly erroneous is irrelevant. . . .

"The Court: Did you ask us to make a finding that all of these findings are clearly erroneous? Or are you saying that, even with these factual findings, you win because targeting shouldn't matter?

"[The Defendants' Counsel]: The latter, Your Honor."

[5] The trial court, instead, noted that an incident during which the plaintiff ripped down posters directly in front of the defendants, leading to a physical confrontation, merely factored in to reducing the amount of damages she could be awarded because the plaintiff played a part in escalating tensions in that specific moment. In addition, the majority also finds that "it is undisputed that all of the posters were placed on or adjacent to public roadways," even though it admits that Janice Smolinski was arrested for trespass and disorderly conduct for placing the posters on private property at the plaintiff's workplace.

[6] The majority asserts that it "find[s] instructive the New Hampshire Supreme Court's recent decision in *Keene*" and that "[g]uided heavily by this . . . decision, which considered similarly targeted and harassing con-

duct, we conclude that a substantial portion of the defendants' conduct that the trial court found to constitute the intentional infliction of emotional distress was, in fact, protected by the first amendment. This is particularly so, given that the trial court's finding that it was solely intended to harass and 'break' the plaintiff did not consider whether those actions were intended to persuade the plaintiff with regard to a matter of public concern as in *Keene*, rather than merely torture her gratuitously with regard to a purely private matter." (Footnote omitted.) I disagree. First, as I have explained previously in this opinion, the trial court did consider whether the defendants' conduct was intended to persuade her with regard to a matter of public concern, and in fact, concluded that the defendants' conduct was "not as the result of a general effort by the [defendants] to find their son and brother but part of an effort to break her." As the trial court determined, the defendants' conduct was not part of a public concern regarding missing persons, but it was about forcing a confession out of a private individual. In contrast, the conduct in *Keene* was intended to convince government actors to quit their job because the protestors believed that parking enforcement was not a legitimate role for government. As the trial court in the present case concluded "it would be an unacceptable restriction on free speech and even hamper police investigations if people did not have a right to bring [facts relevant to persons of interest in an investigation] to the police's or even [the] public's attention," but harassing a private individual to hound a confession from the private individual is not a matter of public concern and free speech is not implicated.

[7] That the context of the speech so clearly demonstrated its bona fide attempt to convey a protected message to the public has led commentators to wonder why the United States Supreme Court granted certiorari in the first instance. E.g., A. Brownstein & V. Amar, "Afterthoughts on *Snyder* v. *Phelps*," 2011 Cardozo L. Rev. De Novo 43, 43–44 ("From a scholarly and professional perspective . . . [*Snyder*] added little to the development of free speech doctrine. . . . [O]ne can only wonder why the [c]ourt thought it appropriate to grant review in this matter in the first place. . . . [W]e think the [c]ourt may have spent more ink than was necessary on the question of whether the content of [the defendant's] speech constituted a matter of public or private concern. Other factors really did the lion's share of the analytic work in this case. . . . The protest was directed to the public at large. This was public discourse, not speech exclusively, or at least primarily, directed at a target audience. If all of these conditions are satisfied, it is not clear to us that classifying speech as a matter of public or private concern is terribly important." [Footnotes omitted.]); A. Caplan, "Free Speech and Civil Harassment Orders," 64 Hastings L.J. 781, 823 (2013) ("[the court's] focus [on the content of the speech] was largely irrelevant to the outcome of the case").

[8] I briefly note that no other cases cited by the majority support its conclusion. With respect to the cases offered for the proposition that the reporting of crime is a matter of public concern, some are inapposite to the present case because the speakers were members of the media fulfilling their role as the press in reporting the existence of truthful facts. See *Cox Broadcasting Corp.* v. *Cohn*, supra, 420 U.S. 492 (broadcast company's broadcast of truthful facts surrounding crime in light of "a society in which each individual has but limited time and resources with which to observe at [firsthand] the operations of his government, [and therefore] he relies necessarily upon the press to bring to him in convenient form the facts of those operations"); *Best* v. *Berard*, 776 F. Supp. 2d 752, 757–58 (N.D. Ill. 2011) (broadcast company's broadcast of plaintiff's arrest analogous to "police blotter"); *Dumas* v. *Koebel*, 352 Wis. 2d 13, 29–30, 841 N.W.2d 319 (App. 2013) (news broadcast intended to inform public about bus drivers' criminal histories and criticize school district's hiring practices). Others are inapposite because the statements at issue criticized public officials in the conduct of their public business. See *Shoen* v. *Shoen*, 292 P.3d 1224, 1230 (Colo. App. 2012) (statements "related to a matter of public concern because they addressed [the speaker's] views about the adequacy of the investigation by public law enforcement officers when unanswered questions remained"); *Wiemer* v. *Rankin*, 117 Idaho 566, 571, 790 P.2d 347 (1990) ("[t]he article addressed the performance of the prosecutor"). Others predicated the first amendment's protections on bases not relevant to the present case; see *Hobbs* v. *Pasdar*, 682 F. Supp. 2d 909, 927–28 (E.D. Ark. 2009) (plaintiff was limited purpose public figure); *Miles* v. *Ramsey*, 31 F. Supp. 2d 869, 875 (D. Colo. 1998) (article was matter of public concern because murder was national "media spectacle"); *Holloway* v. *American Media, Inc.*, 947 F. Supp. 2d 1252, 1261

n.8 (N.D. Ala. 2013) (plaintiff was public figure); or performed incomplete analyses. See *Obsidian Finance Group, LLC* v. *Cox*, 740 F.3d 1284, 1292 (9th Cir.) (no discussion of content, context, and form), cert. denied, U.S.    , 134 S. Ct. 2680, 189 L. Ed. 2d 223 (2014).

[9] Nevertheless, because the majority remands the case, I am convinced that the trial court will have no trouble in finding the intentional infliction of emotional distress by a preponderance of the evidence.

[10] The majority concedes that "an accusation of criminal conduct [may be] topically [on] a matter of public concern . . . [which] is a significant, but not dispositive, factor in determining whether speech or conduct is constitutionally protected for purposes of tort liability. Indeed, should an accusation be false, the first amendment does not foreclose liability under a defamation theory in a well pleaded and proven case." See footnote 26 of the majority opinion. The majority also cites to a Mississippi case that, with facts largely identical to the facts of the present case, evinces the requirement that reviewing courts must undertake the relevant first amendment inquiry before affording accusations of criminal conduct the protections of the first amendment. See *Sartain* v. *White*, 588 So. 2d 204, 213 (Miss. 1991) (conducting content, context, and form inquiry to conclude that defamatory accusations of various crimes are generally matter of public concern but not in specific context of acrimonious neighbor dispute).

[11] The majority asserts that "the Mississippi Supreme Court's decision in *Sartain* is a jurisprudential odd duck, which arose from a neighborhood dispute wherein defamation allegations arose from one party's accusations in numerous public fora, such as tirades and letters to public officials, that her neighbors were murderers, robbers, and terrorists." See footnote 33 of the majority opinion. I disagree that *Sartain* is a "jurisprudential odd duck" and, instead, assert that it properly applied the law to allegations made in a personal dispute between families in a neighborhood. Similarly, the present case arose from a personal dispute between two families that knew each other. Like the dispute in *Sartain*, the accusations involved in the present case did not relate to the actions of government officials, but were personal attacks designed to elicit a response from a private individual.

[12] Though I would not reach the issue, I would also conclude that, had she retained the burden of persuasion to prove that she did not murder Bill ab initio, the plaintiff met this burden under any standard. In my view, the plaintiff's testimony that she was unaware of Bill's disappearance until three days after it happened, as well as the trial court's crediting her testimony in other contexts and the lack of any competent evidence to the contrary, is sufficient to establish that she did not murder Bill.